(592 P.2d 135)

No. 49,902

STATE OF KANSAS, *Appellee,* v. MICHAEL L. SATTERFIELD, *Appellant.*

Petition for review denied June 13, 1979.

Opinion filed March 23, 1979.

*Robert D. Hecht,* of Scott, Quinlan & Hecht, of Topeka, for appellant.

*Philip E. Winter,* assistant county attorney, and *Curt T. Schneider,* attorney general, for appellee.

Before MEYER, P.J., ABBOTT and SPENCER, JJ.

ABBOTT, J.: This is a direct appeal by the defendant, Michael L. Satterfield, from a jury verdict convicting him of the crime of

involuntary manslaughter (K.S.A. 21-3404). He was sentenced under the provisions of K.S.A. 1978 Supp. 21-4618, which prohibits probation to a defendant convicted of committing an Article 34 crime in which a firearm is used.

Defendant's appeal basically involves three issues: (1) Whether the trial court erred in permitting limited testimony concerning defendant's exercising his Fifth Amendment privilege against self-incrimination; (2) whether or not an instruction should have been given on involuntary manslaughter and, if so, whether the instruction given was proper; and (3) whether a pathologist should have been permitted to give an expert opinion.

The facts in many areas are not disputed. Defendant concedes the victim was killed by a bullet fired from a gun in defendant's hand. His defense was that he pointed a pistol at the deceased in self-defense, believing it to be empty, and through no intentional act on his part the hammer released, causing the pistol to discharge. The bullet, a .44-caliber hollow-point, struck the deceased on the nose slightly below a point between her eyes and exited the rear portion of her head slightly to the right and about five degrees above a straight line from the point of entry. Expert testimony placed the gun within two to five feet from the victim when the fatal shot was fired. By way of background, the record reveals the deceased, Diane Buerman, and defendant had lived together for over two years. On the day preceding Diane's death she consulted a physician who prescribed a drug for an upper respiratory illness. The drug was an antihistamine with some pain suppressant in a five percent alcohol base. The evening preceding this tragic event, defendant and the decedent made two trips from their home to purchase beer. Less than one hour into the following day, Diane Buerman was dead.

The defendant testified that the decedent became increasingly agitated during a discussion of their proposed future relationship. He concluded that he had never seen Diane so overwrought. As a number of loaded guns were in the house, defendant decided it would be a good idea to unload them. He went into the bedroom and began unloading the .44-caliber handgun which was kept there by cocking it and rotating the cylinder so that the rounds would drop out. After Diane's death, five live rounds were found on the bedroom floor. The pistol held six shells. Defendant testified he thought the gun was empty and lowered the hammer

to the safety position. Later testimony revealed that the cylinder would not rotate nor would the pistol fire until the hammer was returned to a fully cocked position. Defendant testified that just as he placed the hammer in a safety position, he heard Diane scream, "Goddamn you," and turned to find her standing just inside the bedroom holding a rifle which was normally loaded and which she knew how to use. He moved the pistol in front of himself in order to tell her to drop the rifle, and as he did so the pistol discharged, striking Diane in the head and killing her. The defendant also testified that he did not intend to kill her or to even shoot the pistol, which he thought was unloaded, and speculated that his tenseness or jerking motion caused the pistol to discharge.

A few moments before 1:00 a.m. on September 30, 1977, a telephone operator received a call from the defendant requesting that she connect him to the police department, stating that a woman had been murdered and later that, "We had a fight." Other damaging statements were made by the defendant to the effect that Diane went for the M1 and he "just wanted to beat her to the punch," and, "Me and my girl friend got in a fight with guns and I shot her."

When the police arrived the defendant waved them in and said, "Me and my girl friend got in a fight with guns and I shot her." When the police officers entered the bedroom and found Diane on the floor, apparently dead, an empty bolt-action rifle was partially in her hand with the carrying sling across her arm. While defendant was originally charged with first degree murder, that charge was reduced to voluntary manslaughter at the preliminary hearing.

The defense was based on defendant's testimony that Diane was standing upright, holding a rifle. He argued he thought the revolver was empty, that he did not intend to pull the trigger, and that in any event he was defending himself. Over defendant's objection the State presented an opinion from Dr. William G. Eckhart, a board certified pathologist, that Diane was in a position ranging from lying on the floor to sitting when she was shot. This opinion was based solely on his examination of photographs of blood splatters on the wall and floor and from experiments he had previously conducted on blood splatters. If believed by the jury, his opinion was devastating to the defendant, for it was

incompatible with defendant's version on a crucial point and would cast doubt on his testimony.

Defendant contends that the opinion testimony by Dr. Eckhart should have been rejected for two reasons. First, he argues the State failed to comply with the discovery agreement which had been reached earlier in that none of Dr. Eckhart's "results" had been released to the defendant as called for in the agreement. The trial judge took the position that as the agreement, which both the State and defense counsel agreed had been reached, took place in front of a magistrate judge, he was therefore not bound by it and, in addition, that counsel had not caused an order to be signed specifying the time, place and manner of making the discovery and inspection permitted, as required by K.S.A. 22-3212(4). Dr. Eckhart had been listed as a witness for more than two months prior to trial, although he was not designated as a physician. We know of no requirement that he be so listed. Defense counsel claims surprise, stating that while he did not interview Eckhart, he would have done so had he known of his expertise. Counsel has a clear duty in a criminal case to interview all witnesses and cannot be heard to claim surprise as a result of his failure to carry out that duty.

The State takes the position that in any event it did not breach the agreement as it had no written report to forward, and that Dr. Eckhart performed his experiments the morning of trial, thus it had no way of knowing the results before trial.

We need not decide whether the trial judge erred in deciding whether the agreement was enforceable when it had not been reduced to writing, for we are of the opinion that he handled the problem correctly under the circumstances even though he did erroneously refuse to recognize the agreement. A pretrial discovery order under K.S.A. 22-3212 that has been entered into between counsel and approved by a magistrate judge is to be complied with as fully as one approved by a district judge. The trial judge's conclusion that "the court" referred to in 22-3212 is the district judge alone is erroneous. "The court" is the district court and includes all judges at that level, be they magistrate, associate or district court judges.

The trial judge continued the trial until the next day to allow defense counsel to interview Dr. Eckhart. Defense counsel requested a week's continuance. The trial judge appears to have

suggested to counsel that he interview the witness and see what would be necessary. The trial resumed the following morning and counsel for the defendant did not request additional time nor did he state he desired additional time to obtain other witnesses. His cross-examination of Dr. Eckhart was well prepared and executed.

The record is barren of any effort on the part of defense counsel to obtain an expert, or statements that he could not have obtained one during the remainder of the trial and that a longer continuance would have enabled him to produce one who would have expressed an opinion contrary to Dr. Eckhart's. The defendant suggests the trial judge should have barred Dr. Eckhart's testimony. We conclude this drastic step was not necessary under the facts of this case.

The discovery and inspection statute (K.S.A. 22-3212) provides in pertinent part at section (7):

"If, subsequent to compliance with an order issued pursuant to this section, and prior to or during trial, a party discovers additional material previously requested or ordered which is subject to discovery or inspection under this section, he shall promptly notify the other party or his attorney or the court of the existence of the additional material. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this section or with an order issued pursuant to this section, the court may order such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed . . . ."

This statute vests a trial court with wide discretion in dealing with the failure of a party to comply with a discovery order, and it may order additional discovery, grant a continuance or allow such other relief as it deems necessary. *State v. Rogers,* 217 Kan. 462, 537 P.2d 222 (1975). It has been previously held that the State cannot be charged with wrongdoing for failure to permit inspection of evidence not in its possession, custody or control. *State v. Solem,* 220 Kan. 471, 552 P.2d 951 (1976). Kansas requires that the discovery process be as full and complete as the circumstances allow. *State v. Johnson & Taylor,* 223 Kan. 119, 573 P.2d 976 (1977). Nor will the courts condone intentional failure to comply with the explicit terms of a discovery order. *State v. Jones,* 209 Kan. 526, 498 P.2d 65 (1972). As the selection of possible remedies included the action taken by the trial judge, we cannot say the action taken in this case amounted to an abuse of discretion.

Defendant lastly contends that the testimony of Dr. Eckhart was admitted without a proper foundation having been laid, in that he was allowed to give opinions on the basis of insufficient evidence. The opinions that Dr. Eckhart drew from his studies of the blood splatters at the scene, *i.e.,* that the victim was sitting or lying down, not standing, when she was shot, led to conclusions which were directly contrary to statements made by the defendant. The defendant concludes that the admission of this testimony severely prejudiced him well beyond the point whereby the error could be considered harmless. The State contends the opinion was admissible and further responds with an argument to the effect that as Dr. Eckhart's testimony tended to show defendant was guilty of voluntary manslaughter, the jury's acquittal of him on that point shows that the testimony must have been disregarded.

The qualifications of an expert witness and the admissibility of his testimony are matters within the sound discretion of the trial judge. *Hildebrand v. Mueller,* 202 Kan. 506, 449 P.2d 587 (1969). As stated by Justice Alex M. Fromme in *Staudinger v. Sooner Pipe & Supply Corporation,* 208 Kan. 100, 105, 490 P.2d 619 (1971), "The province of an expert witness is to aid a jury in the interpretation of technical facts or to assist in understanding the material in evidence . . ." and the questions "should not require answers involving matters of conjecture or speculation." The expert may render an opinion based on facts within his personal knowledge or observation or made known to him at the trial. *Van Welden v. Ramsay's Inc.,* 199 Kan. 417, 430 P.2d 298 (1967). The opinion must be based on reasonably accurate data available at the scene. *Spraker v. Lankin,* 218 Kan. 609, 545 P.2d 352 (1976).

Here the witness was a forensic pathologist who had conducted an estimated ten thousand postmortem examinations during his twenty-year career. He viewed a number of photographs and slides of the scene and of the decedent, both in black-and-white and in color, which show the distribution of blood on the wall and floor. Some of the photographs he examined contained measuring tapes showing the height of the blood splatters, their location and direction of flow. The witness testified that he had previous experience with similar cases where it was necessary to

determine the activities of individuals based on the distribution of blood. He estimated that he had experience with fifty to sixty people who had been hit with large-caliber bullets, and he was familiar with how the blood from an individual so struck would react. He also testified that he had made some tests with blood splatters and that he also had experience with the type of marks made by blood drops on various types of surfaces. The only test he made here involved the pattern made by blood falling at various angles.

The defendant contends that an insufficient foundation was laid in that the witness had never been to the scene, had never constructed a model head at which he had fired the gun involved in this case, was not an expert on firearms or ballistics and did not know the force of the bullet. Further, the witness admitted that the pattern of blood released depends on a number of factors such as the force of the projectile, whether a vein or artery has been severed, the type of wound and the movement of the person after being struck. From this, defendant concludes the witness possessed so little factual data that his testimony was no more than speculation and assumptions. We are of the opinion the factors defendant points out go to the weight of the testimony rather than to its admissibility, and that the trial court correctly let the jury fill its role in making that determination. *Riley v. Holcomb,* 187 Kan. 711, 717, 359 P.2d 849 (1961).

Defendant also questions the introduction of testimony which he feels constituted impermissible comment upon his invocation of his constitutional privilege against self-incrimination. Counsel for defendant made an oral motion in limine, requesting that the court issue an order admonishing the police officers not to disclose that they had informed the defendant of his *Miranda* rights and that the defendant subsequently had exercised those rights. At no time did counsel contend the incriminating statements by defendant were obtained in violation of defendant's rights.

The problem before us does not involve what defendant told the police, but instead arises because the defendant made a number of incriminating statements prior to being given a *Miranda* warning. He then signed a valid waiver, discussed the case with the officers and then exercised his privilege to remain silent. He then made a voluntary statement. Defendant does not now, nor did he at trial, contend the statement is inadmissible.

The trial judge ruled the State could show on direct or cross-examination that the defendant exercised his right to remain silent but could not comment on it at any time during the trial or during closing argument. During the trial, Sgt. Yonally testified he first saw the defendant at the scene where the defendant stated, "Me and my girl friend got in a fight with guns and I shot her." He then testified that defendant was given a *Miranda* warning and, without objection, further testified, "Mr. Satterfield told us that he and his girl friend had had a heated argument and that he had unloaded the .44 right in front of her and he—the other statement I remember is—that he said that she had gone for the M1 and he just wanted to beat her to the punch." Sgt. Yonally also testified that defendant had earlier stated, "[T]hat he had to be careful what he told us because we were the police and that what had happened would have to be decided in a Court of law." On cross-examination, testimony was elicited for the first time that the defendant exercised his privilege to remain silent. His exercise of that privilege was again referred to by Detective Blomenkamp when the following dialogue took place on direct examination by the State:

"Q. And was there any other conversation at that time?

"A. Yes. He went on to state, 'We cooled down, unloaded the .44. I know it.' And he stopped at that point. And I asked him a question in regard to the .44, what he was referring to as 'unloading'; and he said at that time, 'I don't want to get into any details without an attorney.'

"At that time I did not ask Mr. Satterfield any further questions. I got up and started to leave the room, which is a small room. As I started through the doorway, I heard him say, 'She went for the M1.' And he made some other statement, but I was already partially out of the doorway and did not catch what the rest of the sentence was."

We see little distinction between prohibiting the prosecution from calling attention to a defendant's silence after receiving *Miranda* warnings (*Doyle v. Ohio,* 426 U.S. 610, 49 L.Ed.2d 91, 96 S.Ct. 2240 [1976]) and the situation we have before us wherein the trial judge prohibited comments on the defendant's silence, but allowed evidence to be introduced that the defendant did exercise his privilege. Here evidence of defendant's statements could have been admitted in a meaningful manner without testimony that defendant was given a *Miranda* warning, or that he waived his rights thereunder and subsequently elected to exercise those rights, as it was his privilege to do. Although the State was

prohibited from impeaching defendant by commenting on defendant's election to remain silent by allowing testimony of that election, the same inference was presented to the jury as though the prosecution had commented on it. We hold that under the facts and circumstances present in this case, the trial court erred when it allowed evidence to be introduced that dealt with defendant's election to remain silent in the absence of his attorney.

Nevertheless, a new trial is not required if the court finds from the totality of circumstances that such conduct constituted harmless error beyond a reasonable doubt. *State v. Smith,* 223 Kan. 294, 574 P.2d 161 (1978); *State v. Jordan,* 223 Kan. 197, 574 P.2d 194 (1977). The defendant was not questioned in any way about his invocation of the rights set out in *Miranda,* nor was any comment made by the prosecutor at the trial or during closing argument. In addition, the defendant did not remain silent after being informed of his rights, but talked briefly with the officers about what had happened, saying the same things he later was to say at the trial. While defendant was quoted as terminating the interrogation by saying that he did not want to get into the details of what happened without an attorney, he did sketch out basically what had occurred. The prejudicial inference present in *State v. Clark,* 223 Kan. 83, 89, 574 P.2d 174 (1977); *State v. Fisher,* 222 Kan. 76, 563 P.2d 1012 (1977); and *State v. Mims,* 220 Kan. 726, 556 P.2d 387 (1976) was not raised here in the same degree.

The trial judge found, and we agree, that considering the totality of circumstances, any error introducing evidence of defendant's postarrest silence constituted harmless error beyond a reasonable doubt.

Defendant next raises two objections to the instruction on involuntary manslaughter. Initially he argues that it was clearly erroneous to give such instruction at all, as none of the facts of the case nor the theories of the parties support an instruction that would allow the jury to find that the killing was unintentional, yet committed in the commission of a lawful act done in a wanton manner. Significantly, the defendant does not attack the verdict as being unsupported by the evidence.

Generally, a party is entitled to have an instruction on a lesser included offense given to the jury whenever there is evidence upon which the accused might reasonably be convicted of the lesser offense. *State v. Seelke,* 221 Kan. 672, 561 P.2d 869 (1977).

Even if no request is made, if evidence is present which would support a conviction of the lesser crime, K.S.A. 21-3107(3) requires the trial court to instruct on it. This is so even if the evidence of a lesser offense is not strong or extensive, and it has been held that the unsupported testimony of the defendant alone may be sufficient to require the court to so instruct. *State v. Clark,* 218 Kan. 18, 542 P.2d 291 (1975), *cert. denied* 426 U.S. 939 (1976). The decision is within the trial court's discretion, and reversible error can be found if the court refuses to give an instruction which is justified by the evidence. *State v. Sullivan &* *Sullivan,* 224 Kan. 110, 577 P.2d 1108 (1978).

A number of Kansas cases have dealt with circumstances similar to those before us where there was a self-defense element and a denial of any intent to kill. In three recent cases it was held error for the trial judge *not* to have given an involuntary manslaughter instruction. *State v. Childers,* 217 Kan. 410, 536 P.2d 1349 (1975); *State v. Clark,* 214 Kan. 293, 521 P.2d 298 (1974); *State v. Weyer,* 210 Kan. 721, 504 P.2d 178 (1972). The Supreme Court affirmed the trial court in *State v. Gregory,* 218 Kan. 180, 542 P.2d 1051 (1975), wherein the trial judge also instructed the jury on involuntary manslaughter when evidence existed from which the jury could have convicted the defendant of that offense.

In *State v. Clark,* 218 Kan. 18, the defendant turned to find himself staring into the muzzle of a gun held by his wife. He seized a gun of his own, testified he panicked and, although he claimed he had no recollection of or intent to do so, shot his wife three times, resulting in her death. He was charged with murder and convicted of voluntary manslaughter. The Supreme Court reversed because the trial court failed to instruct on involuntary manslaughter, stating that it would have been possible to find that the shooting was unintentional and was done in self-defense (a lawful act), albeit using excessive force (an unlawful or wanton act).

We conclude there was sufficient evidence in the record to necessitate an instruction on involuntary manslaughter.

Defendant next argues the instruction was erroneously worded in that it infringed upon the ability of the jury to find that the shooting was accidental or in self-defense. The instruction given reads:

"If you find Michael L. Satterfield is not guilty of voluntary manslaughter, then you shall consider if he is guilty of involuntary manslaughter.

"To establish this charge, each of the following claims must be proved:

"1.   That Michael L. Satterfield unintentionally killed Diane L. Buerman;

"2.   That it was done in the commission of a lawful act done in a wanton manner;

"3.   That said act was done in a wanton manner. That it is a wanton act to point a cocked gun at another person, except in self-defense;

"4.   That this act occurred on or about the 30th day of September 1977, in Lyon County, Kansas."

Defendant's objection goes to subsection 3, which he alleges simplifies the term "wanton" and made it easier for the jury to find the defendant guilty. Primarily, defendant contends that subsection 3 should have included a requirement that the pistol was loaded and that defendant could not be guilty of wanton conduct if he believed the pistol to be empty. Obviously the pistol had a cartridge in it and thus was loaded, so the word "loaded" could properly have been included and any error in failing to do so is harmless error. Nor do we find that the instruction is erroneous when all of the instructions are considered, as they must be. *Van Hoozer v. Farmers Insurance Exchange,* 219 Kan. 595, 549 P.2d 1354 (1976). The jury was instructed as to the definition of wanton conduct as set forth in K.S.A. 21-3201(3) and was fully aware that the evidence had to show a realization of the imminence of danger. The trial court added the phrase "except in self-defense" to the complained-of instruction when this point was raised in conference. While the instruction may have been incorrect before this was added, its presence cures any defect that may have existed insofar as the jury could now find that defendant's act of pointing a hair-trigger gun which he had hurriedly tried to unload was justified if done in self-defense. As a complete instruction was given on the self-defense concept itself, the jury was well aware of that option.

What the defendant actually knew or thought about the gun is a question of fact for the jury to decide, and it was properly left for the jurors to determine whether the act was justified or was wanton. The case of *State v. Clark,* 218 Kan. at 22-23, is similar to this one in many respects. The Court there stated:

"The issue then becomes whether, under the facts before the trial court, defendant committed 'a lawful act in an unlawful or wanton manner.' In order to answer this question we must consider defendant's claim of self-defense. The common law principle of self-defense is codified in K.S.A. 21-3211. It provides that any conduct is lawful which is necessary to repel an aggressor's imminent use of

unlawful force. It is apparent that reasonable minds might differ as to the point when conduct necessary to repel an aggressor ceases. From the evidence in this case it could be determined that defendant was justified in drawing and pointing the gun in self-defense, thus creating the lawful act required by the statute. It could also be determined that if the gun was discharged in the manner described by defendant, its discharge could be the result of unlawful or wanton conduct as required by the statute."

The Court concluded that it was up to the jury to make such a determination.

Similarly, here it was up to the jury to decide whether defendant's act was wanton, and while defendant testified that he thought the gun was unloaded, the jury could accept all, part or none of his testimony in making its findings of fact. A pistol is a dangerous instrument and defendant himself attempted to unload it. Numerous needless deaths occur each year when a supposedly empty gun is discharged, striking a victim. The defendant's act of pointing a firearm at a person and causing the trigger to be pulled, which firearm the defendant had carelessly failed to insure was completely unloaded, furnishes a reasonable basis under the circumstances of this case for the instruction. We conclude that while the wording of the instruction in question could have been more exact, when taken as a whole with the others it is not an inaccurate or misleading statement of the law.

Affirmed.