14 P.3d 713 (2000)
142 Wash.2d 471
STATE of Washington, Respondent,
v.
Michael Kelly ROBERTS, Appellant.
No. 65512-0.
Supreme Court of Washington, En Banc.
Argued May 11, 2000.
Decided December 14, 2000.
As Amended February 2, 2001.
*719 Sheryl McCloud, Mair, Camiel & Kovach, Peter A. Camiel, Seattle, Michael Kelly Roberts, Walla Walla, for Appellant.
Norm Maleng, King County Prosecutor, Lee Davis Yates, Deputy, Brian Martin McDonald, Deputy, Seattle, for Respondent.
Carney, Badley, Smith, Spellman, James Elliot Lobsenz, John B. Mitchell, Professor, Seattle, amicus curiae of behalf of WACDL.
*718 JOHNSON, J.
Appellant Michael Kelly Roberts (Roberts) was tried, convicted, and sentenced to death for the aggravated premeditated first degree murder of Elijio "Eli" Cantu (Cantu). Roberts was also convicted of first degree felony murder. Roberts appeals his convictions and sentence. We affirm Roberts' first degree felony murder conviction, reverse Roberts' first degree aggravated murder conviction, and vacate the sentence of death.

FACTS
In 1988, Roberts escaped from a Canadian prison, crossed the United States border, and lived as a fugitive in Washington State. Nearly two years later, Roberts was apprehended when two Seattle area fishermen he had befriended saw information about Roberts' case on a national television program and notified law enforcement of Roberts' whereabouts. Roberts was returned to Canada, but on May 3, 1994, he and fellow inmate Timothy Cronin (Cronin) escaped from the Ferndale Institution, a minimum security facility in Mission, British Columbia, Canada.
After the escape Roberts, with Cronin, returned to Washington. On May 6, 1994, Roberts and Cronin burglarized the residence of Gerald and Evelyn Mee in Edmonds, Washington. Roberts and Cronin stole several items, including a .38 caliber pistol.
Shortly before noon the same day, Roberts and Cronin appeared at Prudent Auto Sales on Ballinger Way Northeast in King County. Roberts spoke with dealership employees Toni Matni and Mike Srour and told the men he was looking for an "old friend" who used to drive a Chevrolet S-10 Blazer. Cantu lived in a small apartment beneath Prudent Auto Sales. Cantu was an associate of the fishermen Roberts had earlier befriended, but was not one of the men who turned Roberts in for the 1988 Canadian prison escape. Roberts knew Cantu had owned a Blazer; Roberts had ridden in the vehicle with Cantu in the past. Roberts had also been to Cantu's apartment in the past. After Toni Matni pointed Roberts in the direction of Cantu's apartment, Roberts and Cronin walked toward Cantu's apartment. According to the dealership employees, Roberts was the person making the inquiries.
At approximately 1:00 p.m., Mike Srour saw Cantu's Blazer leave the area with Roberts behind the wheel and Cronin in the passenger seat. By approximately 9:00 p.m. the same day, Roberts and Cronin had traveled south to Salem, Oregon in Cantu's Blazer. In Salem, the two men robbed the Heliotrope Natural Foods store; Cronin was armed with the stolen .38 caliber pistol. Roberts and Cronin left with about $1,600 cash. Witnesses provided a description of the vehicle, and Oregon police quickly apprehended the two escapees.
Detective James Ragon of the Oregon State Police testified Roberts was cooperative and complied with his commands. Police seized a large amount of cash from Roberts' pocket, a ring he was wearing, his clothing, and his tennis shoes. Roberts also had in his *720 pocket a check deposit slip with Cantu's name and telephone number on it.
After telephone attempts to contact Cantu failed, Oregon authorities asked King County police to visit Cantu's residence. King County police arrived at Cantu's apartment and found a sliding glass door to the back of the apartment unlocked and ajar. In a back hallway of the apartment, the police found Cantu's body tied to a chair. Because the hallway where Cantu was found was narrow, Detective Randy Mullinax, a King County Police Department major crimes investigator, concluded Cantu had been tied to the chair before it was moved into the hallway. The linoleum flooring in the apartment had no scuff or drag marks. At the trial, Cantu's sons testified the chair was usually beside the front door and never in the hallway.
Cantu's hands were each tied separately behind the chair. The rope was then wrapped around a chair leg, stretched under the chair and tied around Cantu's feet in front of the chair. Cantu's mouth was taped shut and a piece of rope was draped over his right shoulder. There was blood from his nose underneath the tape, a small pool of blood beneath the chair, and blood on the right rear leg of the chair.
Cigarette butts were found inside and outside Cantu's apartment; one contained deoxyribonucleic acid (DNA) from saliva. Roberts had the same polymarker typing as that in the DNA sample. At trial, Dr. Thomas Blake, a forensic serologist at Forensic Science Associates, testified that in the Caucasian and Mexican American populations approximately only one in 14,000 individuals has the same polymarker typing as that contained in the cigarette butt. Neither Roberts' nor Cronin's prints were found in Cantu's apartment. Although the State presented substantial evidence of footprints in Cantu's apartment, the footprints were concluded not to match Roberts' footprints.
A spot on the right tennis shoe of Roberts was also discovered. Dr. David Bing, director of clinical testing at the Center for Blood Research Laboratories, first tested the spot in September 1994. Although the test confirmed human DNA was present, Dr. Bing was unable to determine a potential donor of the DNA or whether the spot was human blood. The remainder of the sample was stored in a test tube and frozen in the laboratory. In October 1996, after advances in DNA testing, authorities requested Dr. Bing repeat DNA testing on this sample. Dr. Bing was again able to conclude only that human DNA was present. He could not identify the spot as human blood, nor could he identify any potential DNA donors. In closing, the State urged the jury to draw its own conclusions regarding the spot from Roberts' shoe.
Kerstin Gleim, a forensic scientist with the Washington State Patrol Crime Lab, was called at trial to view a videotape of the crime scene. She had never personally visited the crime scene. Based upon her experience, training, and review of this case's blood pattern and blood deposit materials, Gleim concluded Cantu was bound and bleeding before the chair was moved into the hallway. She based her conclusion on the assumption that two spots on the floor behind Cantu were bloodstains from Cantu. Gleim testified these two spots were not tested with a presumptive test for blood, nor were they tested for species. She further testified the spot pattern was consistent with Cantu being carried by two people while he was in the chair.
King County Chief Medical Examiner Donald Reay testified although Cantu died of massive internal bleeding caused from a single stab wound to the chest and aorta, the ligature around Cantu's neck had been repeatedly tightened and loosened while he was still alive. Dr. Reay identified four abrasions on Cantu's neck. Dr. Reay opined that a ring on the attacker's hand could have caused the abrasions and that the ring seized from Roberts could have caused the marks. Dr. Reay also testified there were no apparent signs of struggle.
Dr. Marie Russell, the only person in the country with dual credentials in emergency medicine and forensic pathology, disagreed with Dr. Reay's conclusions. She testified that for a ring to have cause the abrasions, it would have had to line up perfectly with the ligature line at four different points, four *721 different times. She testified the abrasions appeared where neck muscles naturally stand out and, therefore, the most reasonable explanation for the physical evidence, particularly the abrasions and the ligature mark, was that one person strangled Cantu.
On May 8, 1994, two days after Roberts' and Cronin's capture, Cronin made a tape-recorded statement to two King County Detectives in Oregon. Cronin denied murdering Cantu and claimed Roberts admitted killing Cantu after Cronin had left the apartment. Cronin admitted he and Roberts visited Cantu at his apartment. Cronin alleged that Cantu refused to give Roberts and Cronin a ride to Seattle, and Roberts then suggested binding Cantu to prevent him from calling the police. According to Cronin, Roberts bound Cantu and taped his mouth, and Cantu did not resist. Later in the taped statement, Cronin admitted helping Roberts bind Cantu. Cronin denied seeing a ligature around Cantu's neck. Cronin stated he and Roberts moved Cantu into a corner of the apartment to prevent his detection by others, he then left to get Cantu's truck, and Roberts joined him a short time later. Cronin stated he wiped his fingerprints from Cantu's doorknob after leaving the apartment. Cronin alleged that on the way to Oregon Roberts admitted killing Cantu, putting his finger against Cronin's chest and saying, "I signed it the same way I did my last one." Clerk's Papers (CP) at 2083.
Cronin also allegedly made statements to fellow inmates while held in the Marion County Correctional Facility in Salem, Oregon. Jail inmate Kenneth Houghton made a written statement and would have testified at trial that Cronin said, "I screwed up," and "I don't know why I did what I did." CP at 2061. Inmate Houghton would have further testified that Cronin said he dreamed of his strangulation of Cantu and of Cantu's eyes bulging during the strangulation. Jail inmate Kevin Ives also submitted a written statement and would have testified at trial that he overheard Cronin admit on at least 5 to 10 occasions he would accept responsibility for killing Cantu, and that Cronin admitted murdering Cantu. Jail inmate Michael Tucker made a written statement and would have testified at trial that he heard Cronin tell Roberts he would "take care of the situation" in Seattle, and "I screwed up. I don't know why I did what I did," and "Don't worry, I'll do the right thing." "I'm going to take this off you" and "I'm hoping to get life without parole." CP at 2066-67. Jail inmate Chad Ramsey, whose cell was next to Roberts', made a written statement and would
have testified at trial that Roberts asked Cronin why he was lying about the murder and why he did it, and that Cronin said he was sorry he did it and that he would "clean it up" in Seattle. CP at 2046.
The defense made a motion pretrial to admit Cronin's statement into evidence. The trial court denied the motion and refused to admit Cronin's tape-recorded statement into evidence, ruling it was untrustworthy hearsay and not a statement against interest. At Cronin's separate trial, this same statement was proffered by the State and admitted into evidence by the same trial judge who denied Roberts' motion. The trial court further denied Roberts' motion to admit the jail inmates' written statements into evidence, ruling the statements were not exculpatory as to Roberts, were not assertions as to past fact, and were not clearly corroborated. During trial, the defense renewed its efforts to have Cronin's and the jail inmates' statements admitted, but the trial judge again denied the motion.
On May 17, 1994, the State charged Roberts and Cronin with aggravated murder in the first degree. On February 12, 1996, by way of amended information, the State charged Roberts and Cronin in a single count with aggravated murder in the first degree or, in the alternative, felony murder in the first degree.
Brian Tsuchida of the King County Public Defender's Association was named as Roberts' court appointed counsel; on June 13, 1994, Tsuchida filed a notice of appearance in King County Superior Court. Two days later, the King County Office of Public Defense (OPD), for administrative reasons, reassigned Roberts' case to the Society of Counsel Representing Accused Persons (SCRAP). On June 15, 1994, SCRAP attorneys Kern *722 Cleven and Terry Mulligan each filed a notice of appearance in King County Superior Court. On June 21, 1994, SCRAP attorney David Wieck also filed a notice of appearance in Superior Court. On September 28, 1994, Brian Tsuchida filed a notice of withdrawal of attorney in King County Superior Court. On March 14, 1995, after the State filed a notice it would seek the death penalty, Roberts filed a pro se motion to disqualify attorneys Cleven, Mulligan, and Wieck. On April 27, 1995, Roberts filed another pro se motion for appointment of specific counsel, Brian Tsuchida. A hearing was held to discuss the pro se motions; attorneys from OPD and SCRAP were present. Robert Boruchowitz of the King County Public Defender's Association stated that his office was "maxed out in terms of [its] ability to handle any felony assignments, and would be sorely pressed to take on another aggravated homicide, particularly one that the [death] penalty decision has already been made and the trial is pending." Verbatim Report of Proceedings (Pretrial Mots. May 5, 1995) at 9. Furthermore, "Mr. Tsuchida, ... as a Felony Division supervisor, is not in a position to take on a death-penalty case, personally, and would not do so." Id. at 8. The trial court granted Roberts' pro se motion to dismiss present counsel upon the appointment of new counsel by OPD, but allowed OPD to decide who would serve as replacement counsel.
Through discovery, defense counsel learned the State obtained various Canadian records on Roberts. The records included:
Cronin's and Roberts' criminal convictions, underlying investigations, dates and places of incarceration, property and visitor logs, release and parole dates, incidents occurring within the institutions, and investigation into Roberts' escape in 1988 and Cronin's and Roberts' escape in 1994.
[The file also included] the results of psychological evaluations which Roberts was required to submit to prior to any evaluation or decision on parole.
CP at 2118. Apart from the "inmates['] name and age, the fact that they are federal prisoners, the courts of conviction and an enumeration of criminal convictions, nature of current offenses, length and dates of sentences, and conditions of release along with release eligibility dates[,] ... [m]ost other documents maintained by the Canadian prison system fall within the definition of `personal information' under the Canadian Privacy Act." CP at 2119. The State acknowledged it obtained this information by filing a Request for Assistance, as required by the Treaty Between the Government of Canada and the Government of the United States of America on Mutual Legal Assistance in Criminal Matters. Roberts' records were obtained through the United States Department of Justice. The letter sent by the Department of Justice stated the facts surrounding the charges, stated Cronin and Roberts were charged with aggravated murder, and stated Washington was seeking the death penalty. Under the heading, "NEED FOR ASSISTANCE," the paragraph begins: "The prosecutor, to convict the defendants of the aggravated murder of Eli Cantu...." CP at 2165.
The defense moved to exclude the Canadian institutional records, arguing "these records were obtained in violation of the Canadian Privacy Act, the Canada-USA Mutual Legal Assistance in Criminal Matters Treaty, and the Canadian Charter of Freedoms." CP at 1819. The trial court initially reserved ruling on the motion but, on the following day, denied the motion "except as to those psychological documents that cannot be used affirmatively by the state." CP at 1937.
Jury selection began April 18, 1997. The court denied Roberts' challenges for cause against at least 13 jurors.[1] Roberts exercised peremptory challenges against 6 of the original 13, exhausting all of his original peremptory challenges; the State exercised a peremptory challenge against the 7th. Ultimately, only 1 of the 13 original jurors challenged for cause by Roberts was seated on the jury. That juror was seated as an alternate but never served as a juror on the trial or participated in deliberations.
Without soliciting questions from the defense, the trial court excused two prospective jurors sua sponte: juror Endicott and juror *723 Schau. Juror Endicott expressed absolute opposition to the death penalty:
Q: You were asked the question whether your views would lead you to always vote against the death penalty regardless of the facts or circumstances of the case. You answered yes.
A: Yes.
Q: Is that your view today?
A: Yes, it is.
7 Verbatim Report of Proceedings (RP) at 460. Juror Schau, the principal of a Catholic school in Skagit County, was equally adamant:
Q: Then on the death penalty, I think you indicated pretty emphatically andโ
A: Uh-huh, I feel very strongly about that.
Q: โthat you could not consider the death penalty at all?
A: Right.
Q: I take it you adhere to the Roman Catholic doctrine on that subject?
A: Right.
7 RP at 559.
The trial court also excused three jurors without consulting either the prosecution or the defense: juror Pechman, juror Walker, and juror Stepper. Former King County Superior Court Judge Marsha Pechman was a prospective juror.[2] Judge Pechman told the court if either of the parties planned to strike her from the jury, it would be convenient if she were struck sooner rather than later since she was attending a conference in Spokane. The State later indicated it was "willing to agree to strike her from the pool and allow her to go, let her, release her and let her go over there. I don't know whether the defense is inclined to do that or not." 11 RP at 1305. The defense replied, "[w]e like her, your Honor, as a juror.... We intend to keep her on at this point.... We would love to accommodate her, but there is something more important at this point." 11 RP at 1306. The trial court was initially inclined to excuse juror Pechman on grounds of hardship, but abandoned that position after defense counsel objected. Rather, because the State confirmed it planned to use a peremptory challenge against juror Pechman, the trial court treated the dismissal as the State's peremptory challenge.
The trial court also excused for cause jurors Walker and Stepper after originally indicating neither would be dismissed for cause. Although the State and Roberts now assert the State challenged for cause juror Walker, this assertion appears to be inaccurate. The State simply noted it "would indicate the state obviously won't challenge Mr. Walker for cause because obviously he ... gave some instances where he could impose the death penalty. However, in terms of the court's order and promise, I would like him to be put on the list of less likely jurors." 7 RP at 443-44. The defense challenged for cause juror Stepper. The trial court denied the challenge, but stated, "Mr. Stepper will be recorded in my system of notation as perhaps an offset to Mr. Walker, Juror No. 2, who was questioned yesterday morning." 8 RP at 672.
The trial court excused both Walker and Stepper without informing counsel prior because "[a]s we got further through the process and had dealt with more individuals, the court reassessed its position, and altered its ruling to grant each of those challenges. The court found that each of those jurors, Mr. Walker and Mr. Stepper, would be substantially impaired in their performance of their functions as jurors." 13 RP at 1621-22.
At the close of jury selection, the trial court noted a surplus of jurors and offered two free peremptory strikes to the defense and one to the State. The defense declined to accept the invitation of the court.
Roberts' jury trial began May 5, 1997. The defense attempted to call Cronin as a witness, but Cronin asserted his Fifth Amendment right not to testify after giving his name, date of birth, and current residence.
*724 The defense called Dr. Randell Libby, a molecular geneticist and principal scientist in the cardiovascular pathology section at NeoRx Pharmaceutical Corporation, to testify about the unreliability of DNA tests introduced by the State. During its cross-examination of Dr. Libby, the State asked the following:
Mr. Davidheiser: On at least one occasion, you, yourself, engaged Mr. Connick as your attorney in court proceedings in Oregon; isn't that true?
Mr. Connick: Your Honor, not only am I going to be objecting, I ask this lawyer be sanctioned.
Mr. Davidheiser: It goes to bias.
The Court: The objection is sustained. Let's move on.
Mr. Connick: Your Honor, I want him sanctioned. It's a misrepresentation.
Mr. Davidheiser: It's not a misrepresentation.
The Court: The jury is to disregard the question in its entirety and any comments made by counsel in your presence.
28 RP at 3964-65. The defense moved for a mistrial at the conclusion of Dr. Libby's testimony, which the trial court denied:
Well, it was certainly inappropriate to raise it in the fashion it was raised without bringing it to the court's attention first and having a discussion as to whether or not it would be a permissible area of inquiry. It's clearly collateral. There obviously was a potential for prejudice there if the court had allowed the question to be answered or even the question to stand. It did not. The jury was instructed to disregard it.
28 RP at 3987.
The trial court also approved three specific jury instructions to which Roberts now assigns error. Guilt phase jury instruction 7 addressed the law of accomplice liability. It read as follows:
You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of a crime.
A person is an accomplice in the commission of a crime, whether present at the time of its commission or not, if, with knowledge that it will promote or facilitate its commission, he either:
(a) solicits, commands, encourages or requests another person to commit the crime; or
(b) aids another person in planning or committing the crime.
The word "aid" means any assistance whether given by words, acts, encouragement, support or presence. A person who is present at the scene and ready to assist by his presence is aiding in the commission of the crime. However, more than mere presence at the scene and knowledge of the criminal activity of another must be shown in order to establish that a person is an accomplice.
CP at 2654. Jury instruction 8, the "to convict" instruction, read in relevant part:
To convict the defendant Michael Kelly Roberts of the crime of premeditated murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about the 6th day of May, 1994, the defendant or someone to whom he was an accomplice, stabbed Elijio V. Cantu;
(2) That Elijio V. Cantu died as a result of this stabbing;
(3) That the stabbing was done with the intent to cause the death of Elijio V. Cantu;
(4) That the intent to cause the death was premeditated; and
(5) That the acts occurred in the state of Washington.
CP at 2655. Finally, jury instruction 9 addressed the finding of the two aggravating factors alleged by the State. It read as follows:
If you find the defendant Michael Kelly Roberts guilty of the crime of premeditated murder in the first degree, you must then decide whether any of the following aggravating circumstances has been proved:

*725 (1) The defendant and his accomplice committed the murder to conceal the commission of a crime or to protect or conceal the identity of a person committing a crime; or
(2) The murder was committed in the course of, in furtherance of, or in immediate flight from a robbery in the first or second degree or a kidnapping in the first degree.
The state has the burden of proving the existence of an aggravating circumstance beyond a reasonable doubt. In order to find that an aggravating circumstance has been proved in this case, you must unanimously agree that the particular aggravating circumstance has been proved beyond a reasonable doubt.
You should separately consider each of the aggravating circumstances alleged. If all twelve of you agree that a specific aggravating circumstance has been proved beyond a reasonable doubt, you should fill in the answer "yes" on the special verdict form as to that circumstance.
You will also be asked on the special verdict form whether or not it has been proved that the defendant Michael Kelly Roberts personally acted with a premeditated intent to cause the death of Elijio Cantu. In order to answer "yes" to this question, all twelve of you must agree that this proposition has been proved beyond a reasonable doubt.
CP at 2656.
Defense counsel objected to jury instruction 7, arguing because it read "of a crime" rather than "of the crime charged," the instruction permitted the jury to treat Roberts as an accomplice for all purposes if it found him an accomplice for any one of the underlying crimes. During the State's closing argument, the defense objected when the State suggested Roberts could be an accomplice to the aggravating factors. Defense counsel did not otherwise object to jury instructions 8 or 9.
On June 11, 1997, the jury returned its verdict and found Roberts guilty of first degree felony murder and first degree premeditated murder. The jury further found, by special interrogatory, that Roberts acted with premeditated intent. The jury finally found both aggravating factors existed, and the case proceeded to the penalty phase. Following the penalty phase, the jury voted to impose a sentence of death. The State filed a notice of statutory appeal with this court. Roberts appeals his convictions and his sentence.

ANALYSIS
Roberts raises 20 assignments of error. We reach individually those claims necessary for the disposition of this case or those likely to reoccur on retrial.
1. Exclusion of Cronin's Statements
Roberts argues the trial court erred in excluding Cronin's tape-recorded confession to the police, as well as his later statements to Roberts and other jail inmates. The State maintains the trial judge properly excluded these statements. We address each of these statements in turn.
a. Cronin's Confession to the Police
Roberts alleges Cronin's confession to police should have been admitted into evidence under the statement against interest exception to the hearsay rule, Rules of Evidence (ER) 804. This exception provides as follows:
(b) Hearsay Exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
. . . .
(3) Statement Against Interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating *726 circumstances clearly indicate the trustworthiness of the statement.
ER 804(b)(3).
No question is raised in regard to Cronin's unavailability; he asserted the Fifth Amendment when called to testify at Roberts' trial. See State v. Edmondson, 43 Wash.App. 443, 447, 717 P.2d 784 (1986). Thus, the next question is what qualifies as Cronin's "statement" as the term is used in ER 804(b)(3). Roberts contends that Cronin's extensive confession may be redacted so that only those portions actually against Cronin's interest would constitute his "statement." The State counters that Cronin's entire confession is his "statement" and, therefore, must be excluded in its entirety.
The United States Supreme Court recently examined the meaning of the word "statement" in Federal Rule of Evidence 804(b)(3). See Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994).[3] The Court narrowly construed the word "statement" to mean "`a single declaration or remark,'" as opposed to an extended declaration (narrative). Williamson, 512 U.S. at 599, 114 S.Ct. 2431 (quoting Webster's Third New International Dictionary 2229 (1961)). In Williamson, the prosecution sought to introduce the hearsay narrative of the defendant's drug courier. The admitted narrative contained both disserving and self-serving statements. The Court held the word "statement" in Federal Rule of Evidence 804(b)(3) meant "a single declaration or remark...." Williamson, 512 U.S. at 599, 114 S.Ct. 2431. Given this definition, the Court concluded the trial court erroneously admitted portions of the hearsay narrative not against the declarant's interest, along with portions that were against the declarant's interest. The Court reasoned while reasonable people "tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of `statement.' The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." Williamson, 512 U.S. at 599.
Williamson rejected what is called the "whole statement" approach; its holding requires the federal courts to examine a proffered hearsay narrative, separate the inculpatory portions from those that are self-serving, and redact the narrative to exclude the self-serving statements. Williamson, 512 U.S. at 603, 114 S.Ct. 2431; see also United States v. Sposito, 106 F.3d 1042, 1049 (1st Cir.1997); 5C Karl B. Tegland, Washington Practice: Evidence ง 804.36 (4th ed.1999).
Roberts urges us to adopt the definition of the word "statement" utilized by the Williamson Court. The State contends Williamson is not on point because the issue there was whether an entire narrative was properly admitted, not whether portions of a statement were properly excluded. The State also suggests the holding of Williamson is contrary to our precedent because, like pre-Williamson federal courts, Washington courts have in the past essentially applied a "whole statement" analysis to "mixed" narrativesโhearsay statements that both inculpate and exculpate the declarant. See, e.g., State v. Rice, 120 Wash.2d 549, 844 P.2d 416 (1993); State v. Whelchel, 115 Wash.2d 708, 801 P.2d 948 (1990); State v. St. Pierre, 111 Wash.2d 105, 759 P.2d 383 (1988); State v. Valladares, 31 Wash.App. 63, 639 P.2d 813 (1982), aff'd in part, rev'd in part, 99 Wash.2d 663, 664 P.2d 508 (1983); State v. Parris, 30 Wash.App. 268, 633 P.2d 914 (1981), aff'd, 98 Wash.2d 140, 654 P.2d 77 (1982).
Initially, the State fails to explain the relevance of the distinction between the procedural posture of Williamson and the procedural posture of this case. The word "statement" does not mean one thing when the State seeks to introduce testimony against a defendant, and another when the defendant wishes to introduce testimony in his own defense. Nor is the approach of Williamson precluded by prior decisions of this court. In Washington, admissibility under *727 ER 804(b)(3) has turned "on whether the disserving or self-serving considerations predominated in the mind of the declarant at the time the statement was made." 5C Tegland, supra, ง 804.36; see also Whelchel, 115 Wash.2d at 721-22, 801 P.2d 948 (statement was self-serving based on overall circumstances even though portions were inculpatory); Valladares, 31 Wash.App. at 69-70, 639 P.2d 813 (statement against interest even though portions were exculpatory). This approach was derived from the Courts of Appeals opinions in Parris and Valladares. E.g., Valladares, 31 Wash.App. at 69, 639 P.2d 813.
This court, however, has never explicitly adopted a "whole statement" approach. Although this court impliedly affirmed the ER 804(b)(3) analysis of Parris and Valladares,[4] it has never expressly held or even considered the issue of whether the "whole statement" approach is the proper analysis under ER 804(b)(3), especially in light of Williamson.[5] Furthermore, our decisions in Parris and Valladares followed the federal approach to ER 804(b)(3) at the time they were decided. See Valladares, 99 Wash.2d at 668, 664 P.2d 508 (citing Parris, 98 Wash.2d 140, 654 P.2d 77).[6] The federal courts and at least 10 states now follow the Williamson approach.[7] We adopt it as well.
We do so because Williamson is based on a reading of ER 804(b)(3) more consistent with the rule's underlying principle. Hearsay is excluded because "out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener." Williamson, 512 U.S. at 598, 114 S.Ct. 2431. As the text of the rule suggests, however, a hearsay "statement which ... at the time of its making ... so far tended to subject the declarant to ... criminal liability" is one "that a reasonable person in the declarant's position would not have made ... unless the person believed it to be true." ER 804(b)(3). Hearsay "statements against interest" are admissible "because it is presumed that one will not make a statement damaging to one's self unless it is true." 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence ง 804.06[1] (1997 & Supp.1999).
The "whole statement" approach, however, often admits "statements" which do not fall under this rubric. See State v. Rice, 120 Wash.2d 549, 844 P.2d 416 (1993); State v. St. Pierre, 111 Wash.2d 105, 759 P.2d 383 (1988). The "whole statement" approach also excludes statements that are clearly against the declarant's interest, simply because they are part of a larger "finger pointing" narrative. See St. Pierre, 111 Wash.2d 105, 759 P.2d 383. The "whole statement" approach is, therefore, both overbroad and underbroad.
This is evident from the facts of this case. Cronin's confession to the police is 45-pages *728 long. The trial court excluded the entire statement, despite the fact that portions were obviously against Cronin's interest. The defense was clear that it sought admission of those portions only, with the remaining sections of the statement redacted. Referring to the portions it wished to admit, the defense noted, "essentially what Mr. Cronin did in that statement was confess to a felony/murder." 4 RP at 271. The trial court responded, "[a]nd accuse a premeditated murderer." 4 RP at 271. The trial court, therefore, unnecessarily took an all or nothing approach to what constituted Cronin's statement, thereby saddling itself with the almost impossible task of determining whether the entirety of a 45-page confession was either inculpatory or exculpatory.
The State suggests considering portions of the confession separately would allow Roberts to mislead the jury by arguing Cronin committed the murder based on incomplete testimony. According to the State, "[s]uch a result would have been completely inconsistent with the truth seeking function of a trial and the principles that underlie the rules of evidence." Resp't Answer to Amicus Curiae Washington Association of Criminal Defense Lawyers (WACDL) Br. at 8. This argument is unconvincing for several reasons.
First, as amicus WACDL correctly notes, the entirety of Cronin's confession might have been admissible. The portions inculpating Cronin are admissible under ER 804(b)(3) as statements against Cronin's interest. The remainder would be admissible if offered by Roberts because the defense would not offer it for the truth of the matter, but to argue its falsity. It would, therefore, not be hearsay at all. ER 801(c). Subject to other rules of evidence and the discretion of the trial court, the State could also move to admit the entire statement under ER 106, the rule of completeness. E.g., State v. Alvarado, 89 Wash.App. 543, 553, 949 P.2d 831 (1998); State v. Alsup, 75 Wash.App. 128, 133, 876 P.2d 935 (1994); see also United States v. Dorrell, 758 F.2d 427, 434-35 (9th Cir.1985); United States v. Sutton, 801 F.2d 1346, 1366 (D.C.Cir.1986).
Second, allowing Roberts to introduce Cronin's statements against interest while excluding Cronin's self-serving statements is consistent with the truth seeking function of a trial. Under the rules of evidence, the self-serving portions of Cronin's statement that also inculpate Roberts are assumed to be false and unreliable. See, e.g., Lee v. Illinois, 476 U.S. 530, 545, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)("The true danger inherent in this type of hearsay is, in fact, its selective reliability. As we have consistently recognized, a codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability....").
Finally, the Williamson approach does not mean all "statements" against interest as construed therein will be admitted into evidence. The reliability prong of the rule must, of course, also be satisfied. This provides discretion to the trial judge to exclude redacted statements that are, nonetheless, unreliable. State v. McDonald, 138 Wash.2d 680, 693, 981 P.2d 443 (1999)(trial court's decision on reliability of ER 804(b)(3) statement reviewed for abuse of discretion). Here, the State suggests that under our multi-factor test set forth in State v. Anderson, 107 Wash.2d 745, 733 P.2d 517 (1987), Cronin's confession was also properly excluded on reliability grounds. Roberts contends the statement was reliable, noting the State offered and the same trial judge admitted the confession into evidence at Cronin's separate trial.
Anderson addressed the reliability of inculpatory hearsay statements that raised confrontation clause concerns because the statements were introduced by the State against the defendant.[8]Anderson, 107 Wash.2d at 746, 733 P.2d 517. Here, because Roberts offered the statements, no confrontation *729 clause issues exist. Because the offered portions were against Cronin's interest and offered by the defense, the presumption is admissibility and not exclusion. Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)(constitutional right for defendant to present hearsay evidence in certain circumstances); see Anderson, 107 Wash.2d at 749, 733 P.2d 517 (rules of evidence do not "circumscribe the limits of constitutional rights").
Furthermore, under the Anderson test, the relevant portions of Cronin's statement are unquestionably reliable. The factors to be considered are as follows:
1. Was there an apparent motive for declarant to lie?
2. What was the declarant's general character?
3. Did more than one witness hear declarant's statement?
4. Was the statement made spontaneously?
5. Did the timing of the statements and the relationship between declarant and witness suggest trustworthiness?
6. Does the statement contain an express assertion of past facts?
7. Did the declarant have personal knowledge of the identity and role of the crime's other participants?
8. Was the declarant's statement based upon faulty recollection?
9. Was the statement made under circumstances that provide reason to believe the declarant misrepresented defendant's involvement in the crime?
McDonald, 138 Wash.2d at 694, 981 P.2d 443.
Cronin's statement was made within 48 hours of his arrest. It was heard by witnessesโtwo King County detectivesโand was also tape-recorded. The declarant, Cronin, not only had personal knowledge of the crime but was the only witness other than Roberts to have such knowledge. Cronin confessed to helping tie Cantu to the chair, moving Cantu in the chair, stealing Cantu's wallet and keys, and wiping his fingerprints from Cantu's apartment. Cronin hardly had a motive to implicate himself for at least first degree felony murder, even if he did have a motive to shift blame to Roberts.
Ironically, the State itself has been perhaps the strongest proponent of the reliability of Cronin's statement to the police. The State put this statement before the jury in Cronin's trial on the grounds it placed Cronin at the scene of the crime and implicated him in its concealment. See Appellant's Opening Br. at 21-28 (detailing numerous references to this statement in Cronin's trial, State v. Cronin, No. 94-1-03250-6 (King Co.Super.Ct. Mar. 21, 1997)). Remarkably, the State adheres to this position in Cronin's appeal of his conviction to this court, while taking the opposite position in Roberts' appeal. See Br. of Resp't at 15, 43, State v. Cronin, No. 69043-0 (Wash. Dec. ___, 2000). The State must have believed Cronin's statements were true, or the State committed ethical and constitutional violations by introducing the testimony in Cronin's appeal. RPC 3.3; RPC 3.4; Giglio v. United States, 405 U.S. 150, 153, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Smith v. Groose, 205 F.3d 1045, 1051 (8th Cir.2000).
Because portions of Cronin's statement, although hearsay, were both reliable and against Cronin's interest, the trial court erred by excluding the statement in its entirety. Furthermore, if the jury had heard the extent to which Cronin was involved in the homicide, it might have concluded Roberts committed first degree felony murder only. Cronin confessed to helping tie Cantu to the chair, moving Cantu in the chair, stealing Cantu's wallet and keys, and wiping his fingerprints from Cantu's apartment. Roberts did not testify.
In summary, we adopt the definition of "statement" utilized by the Williamson Court. We hold the trial judge erred in failing to consider portions of Cronin's police confession as separate "statements" for the purposes of the statement against interest exception to the hearsay rule. We also hold the trial judge erred in concluding Cronin's confession was unreliable, especially in light of its admission at Cronin's separate trial. We, therefore, reverse Roberts' aggravated first degree murder conviction and his sentence *730 of death. We review the remaining assignments of error to the extent they bear on Roberts' felony murder conviction or are likely to arise on retrial.
b. Cronin's Statements to Fellow Jail Inmates
The trial court also ruled Cronin's statements to his fellow jail inmates were inadmissible under the statement against interest exception because they were unreliable. To determine the reliability or trustworthiness of a proffered hearsay statement, we once again consider the Anderson factors outlined above. See McDonald, 138 Wash.2d at 694, 981 P.2d 443.
As the trial court noted, Cronin had an obvious motive to lie to the inmates: "it is not at all surprising that Mr. Cronin would seek to mollify Mr. Roberts, who by the way had apparently murdered another fellow inmate at some point in the past...." 4 RP at 289. One jail inmate stated that Cronin falsely claimed he was charged with killing a Seattle police officer. Furthermore, like the declarant in McDonald who also confessed to a fellow jail inmate, Cronin's statements to the inmates contradicted each other, casting even more doubt on Cronin's general character and veracity of those admissions. Finally, unlike the statement Cronin made to the police, Cronin's statements to the jail inmates were made months after Cantu's death and were not tape-recorded.
The trial court did not abuse its discretion in finding these statements unreliable.
2. Jury Instructions: Aggravating Factors
Roberts next argues the accomplice liability, "to convict," and aggravating factors jury instructions 7 through 9, supra, allowed the jury to improperly apply guilt phase accomplice liability principles to penalty phase aggravating factors. Roberts contends these instructions, therefore, violated our aggravated murder statutes, the Eighth and Fourteenth Amendments to the United States Constitution, and the due process and cruel punishment clauses of the Washington State Constitution. The State argues Roberts never objected to the aggravating factors jury instruction at trial and is, therefore, barred from raising the issue on appeal. The State further argues if the merits of the instructions are reached, the aggravated murder statutes do allow for the execution of an accomplice, and the instructions given in this case are valid under this court's holding in State v. Mak, 105 Wash.2d 692, 745, 718 P.2d 407 (1986).
We first address the State's contention that the defense failed to preserve this issue for appeal. An error may be raised for the first time on appeal if it is a manifest error involving a constitutional right. RAP 2.5(a)(3); McDonald, 138 Wash.2d at 691, 981 P.2d 443. An error is "manifest" if it had "`practical and identifiable consequences in the trial of the case.'" State v. WWJ Corp., 138 Wash.2d 595, 603, 980 P.2d 1257 (1999) (quoting State v. Lynn, 67 Wash.App. 339, 345, 835 P.2d 251 (1992)).
Extensive authority supports the proposition that instructional error of the nature alleged here is of sufficient constitutional magnitude to be raised for the first time on appeal. E.g., State v. Deal, 128 Wash.2d 693, 698, 911 P.2d 996 (1996) (citing State v. Peterson, 73 Wash.2d 303, 306, 438 P.2d 183 (1968)); State v. Scott, 110 Wash.2d 682, 688 n. 5, 757 P.2d 492 (1988)(citing cases where instructional errors are considered of constitutional import); State v. Green, 94 Wash.2d 216, 231, 616 P.2d 628 (1980); State v. Byrd, 72 Wash.App. 774, 782, 868 P.2d 158 (1994), aff'd, 125 Wash.2d 707, 887 P.2d 396 (1995); Martinez v. Borg, 937 F.2d 422, 423 (9th Cir.1991). This is not a case where a jury instruction merely failed to define a term, or where a trial court did not instruct on a lesser included offense that was never requested. See Scott, 110 Wash.2d at 688 n. 5, 757 P.2d 492. The State cites no contrary authority on point. Furthermore, the record demonstrates defense counsel did object in closing to the State's argument on this portion of the law. We, therefore, turn to the merits of this issue.
"A person is guilty of aggravated first degree murder if he or she commits first degree murder as defined by RCW 9A.32.030(1)(a)" and one or more statutory *731 aggravating circumstances exists. RCW 10.95.020. A person commits first degree murder under RCW 9A.32.030(1)(a) when, "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person...." RCW 9A.32.030(1)(a). Aggravated first degree murder is not a crime in and of itself; the crime is "premeditated murder in the first degree (not murder by extreme indifference or felony murder) accompanied by the presence of one or more of the statutory aggravating circumstances listed in the criminal procedure title of the code (RCW 10.95.020)." State v. Irizarry, 111 Wash.2d 591, 593-94, 763 P.2d 432 (1988)(citing Mak, 105 Wash.2d at 745, 718 P.2d 407; State v. Kincaid, 103 Wash.2d 304, 312, 692 P.2d 823 (1985)).
Based upon the above statutory language, it is debatable whether the aggravated murder statute as worded even allows for the execution of a defendant convicted as an accomplice to first degree murder. The statute narrowly specifies that only those who commit "first degree murder as defined by RCW 9A.32.030(1)(a)" are subject to the death penalty. RCW 10.95.020 (emphasis added). No mention is made of committing first degree murder by way of the accomplice liability statute, RCW 9A.08.020. Furthermore, RCW 9A.32.030(1)(a) requires a mens rea of premeditated intent to kill and an actus reus that causes the death of the victim. The accomplice liability statute requires only a mens rea of knowledge, and an actus reus of soliciting, commanding, encouraging, or requesting the commission of the crime, or aiding or agreeing to aid in the planning of the crime. RCW 9A.08.020(3)(a).
It does appear, however, that the Legislature envisioned, at least in some circumstances, that an accomplice might be subject to the death penalty. In particular, we note one of the statutory aggravating factors refers to the defendant's solicitation of another to commit the killing. RCW 10.95.020(5). We also note it is a statutory mitigating factor if the defendant "was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor...." RCW 10.95.070(4).
Nevertheless, we must construe statutes so as to render them constitutional. In re Personal Restraint of Young, 122 Wash.2d 1, 41, 857 P.2d 989 (1993). The imposition of a capital sentence is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments if it is imposed without an individualized determination that the punishment is appropriate. Harmelin v. Michigan, 501 U.S. 957, 995, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Enmund v. Florida, 458 U.S. 782, 798, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). This rule reflects "the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." Eddings, 455 U.S. at 110, 102 S.Ct. 869 (emphasis added).
The United States Supreme Court has considered the impact of this rule when a state seeks to execute a defendant who may not have performed the actual homicidal act but, instead, is guilty by way of felony murder or accomplice liability. In Enmund, the Court held a defendant who drove the getaway car for a robbery wherein the robbery victims were shot could not be sentenced to death because he did not take life, attempt to take life, or intend for the death to occur. Enmund, 458 U.S. at 784-85, 787, 798, 102 S.Ct. 3368. The Court reasoned,
Enmund did not kill or intend to kill and thus his culpability is plainly different from that of the robbers who killed; yet the State treated them alike and attributed to Enmund the culpability of those who killed the [victims]. This was impermissible under the Eighth Amendment.
Enmund, 458 U.S. at 798, 102 S.Ct. 3368. The Court expressly did not reach the secondary question of "whether the degree of Enmund's participation in the killings was given the consideration required by the *732 Eighth and Fourteenth Amendments." Enmund, 458 U.S. at 787 n. 4, 102 S.Ct. 3368.
This question was partly addressed five years later in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). There, the Court considered whether two defendants who did not actually perform an act of murder but merely aided their father in his escape from prison could, nonetheless, be sentenced to death for brutal murders committed by their father during the escape.[9]Tison held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to [sentence a defendant to death]." Tison, 481 U.S. at 158, 107 S.Ct. 1676. Therefore, Tison also suggested an actus reus requirement along with a mens rea requirement before the death penalty can be imposed. That requirement is at least "major participation" in the crime if the mens rea is less than intent. Tison, 481 U.S. at 158, 107 S.Ct. 1676.
The jury instructions herein allowed Roberts to be convicted of premeditated murder in the first degree solely as an accomplice. Jury instruction 8, the "to convict" instruction, informed the jury that the elements of the crime could be committed by Roberts "or someone to whom he was an accomplice...." CP at 2655. Therefore, the "to convict" instruction did not require the jury to find that Roberts acted with premeditated intent, although a special interrogatory addressed this issue and was answered in the affirmative. The "to convict" instruction also did not require any showing that Roberts personally caused the death of Cantu or actively participated in the events that led to Cantu's death.
The jury next considered the aggravating factors in jury instruction 9:
(1) The defendant and his accomplice committed the murder to conceal the commission of a crime or to protect or conceal the identity of a person committing a crime; or
(2) The murder was committed in the course of, in furtherance of, or in immediate flight from a robbery in the first or second degree or a kidnapping in the first degree.
CP at 2656.
Question one, because of the use of the word "and," requires some form of actus reus on behalf of the defendant, although how much is not specified. See Mak, 105 Wash.2d at 744, 718 P.2d 407. Question two, worded entirely in the passive voice, requires no finding of any actus reus on behalf of the defendant. The jury could have convicted Roberts as an accomplice to premeditated first degree murder and found him eligible for a death sentence based on an affirmative answer to either of the above questions. This, in turn, could impose capital punishment on Roberts even if he did not personally cause the victim's death or if he was only a minor participant in the underlying events.
In Mak, this court addressed the issue of whether aggravating factors questions virtually identical to those given here were valid under Washington law and under Enmund.[10] The Mak court concluded the jury instructions were valid because: (1) the use of the word "and" in the first instruction attributed some personal culpability to the defendant; (2) the second instruction did not use the word "accomplice" and, therefore, raised no concerns; and (3) Enmund was not implicated because the jury found Mak, unlike Enmund, did have a premeditated intent to kill. Mak, 105 Wash.2d at 739-45, 718 P.2d 407.
Mak was decided before Tison, however. Mak also did not address the level of actus reus required to constitutionally sentence a defendant to death. The holding in Tison requires at least "major participation" in the underlying felony before a defendant may be executed based on a charge of first degree felony murder. Tison, 481 U.S. at 158, 107 S.Ct. 1676. We find the present case analogous to Tison because an accomplice, like a felony murder defendant, may be convicted with a lesser mens rea and a lesser actus reus than a principal to premeditated first degree murder. See also Joshua Dressler, *733 Reassessing the Theoretical Underpinnings of Accomplice Liability: New Solutions to an Old Problem, 37 Hastings L.J. 91, 136 (1985)(under Court's reasoning in Enmund, accomplices should not be executed unless they personally caused the death to occur); Andrew H. Friedman, Note, Tison v. Arizona: The Death Penalty and the Non-Triggerman: The Scales of Justice are Broken, 75 Cornell L.Rev. 123, 154 (1989)("the imposition of the death penalty should be predicated upon a finding of direct physical action leading to the decedent's murder").
We, therefore, hold that major participation by a defendant in the acts giving rise to the homicide is required in order to execute a defendant convicted solely as an accomplice to premeditated first degree murder. Merely satisfying the minimal requirements of the accomplice liability statute is insufficient to impose the death penalty under RCW 10.95.020, the Eighth and Fourteenth Amendments, and the cruel punishment clause of the Washington State Constitution. This is especially true in light of our repeated recognition that the Washington State Constitution's cruel punishment clause often provides greater protection than the Eighth Amendment, an argument neither raised nor considered in Mak, but raised by Roberts. E.g., State v. Manussier, 129 Wash.2d 652, 674, 921 P.2d 473 (1996); State v. Bartholomew, 101 Wash.2d 631, 639-40, 683 P.2d 1079 (1984) (Bartholomew II); State v. Fain, 94 Wash.2d 387, 392-93, 617 P.2d 720 (1980); State v. Morin, 100 Wash.App. 25, 29, 995 P.2d 113 (2000); State v. Ames, 89 Wash.App. 702, 710 & n. 8, 950 P.2d 514 (1998).[11]
We further hold the aggravating factors questions posed in jury instruction 9, in conjunction with the accomplice liability and "to convict" jury instructions 7 and 8, are erroneous. The instructions allow a defendant to be sentenced to death without a showing that he or she personally caused the victim's death or was a major participant in the homicidal acts. Even assuming, as we did in Mak, that the word "and" in question one of instruction 9 necessarily requires a finding of some participation by the defendant, this instruction does not specify the degree of participation required to sentence the defendant to death. Furthermore, under the logic of Mak, the instruction could just as easily be worded: "was the murder committed by the defendant to conceal the commission of a crime or to protect or conceal the identity of a person committing a crime?" The additional language is surplusage and serves no purpose other than to invite constitutional error.
Contrary to the State's contentions, it is anything but apparent that the jury would interpret the wording of the jury instructions in this case to require some form of active participation by Roberts. The accomplice liability and "to convict" instructions obscured the meaning of what it meant to "commit" murder. The jury could easily have concluded from reading those instructions in conjunction with one another that Roberts "committed" murder simply by acting as a lookout or aiding in the planning of the offense. RCW 9A.08.020(3). The State's arguments encouraged such an interpretation. While the State contended its theory of the case was that Roberts was the primary actor and personally took Cantu's life, the State argued an accomplice theory as an alternative. The State made reference at least 10 times in closing to the prospect that either Roberts or Cronin could have performed the killing.
The State specifically made the following comments:
They could have temporarily silenced Eli by simply tying him in this chair and taping his mouth, or they could have done, as was done, permanently silenced Eli Cantu by killing him.
Now, it's not clear whether or not Roberts and Cronin would share the same choice, but what is clear is that they both had the same motive, and that was to silence Eli Cantu in some way or to ensure in some way that Eli Cantu wouldn't immediately call police and turn them in.

*734 Under principles of accomplice liability, though, it makes no difference whether or not their choice between temporarily silencing Eli Cantu and permanently silencing Eli Cantu was shared.
31 RP at 4213-14.
Shortly after explicitly turning to the aggravating factors issue, the prosecutor expressly compared the aggravating factors finding required by question two of jury instruction 9 to the jury's determination of whether Roberts was guilty of felony murder:
The simple fact of the matter is objectively does the evidence establish that Eli Cantu was murdered, was the victim of a premeditated murder in the course of a robbery and/or in the course of a kidnapping? The answer to this interrogatory should be an easy yes.
We've discussed this principle, this issue as it relates to felony/murder, and the issue is very similar as it relates to the aggravating factor. The only difference is that here it's an aggravating factor, not an element of the crime as in felony/murder. Here it's an aggravating factor. The difference here is that here it's an aggravating factor applied on to what has been determined to be a premeditated murder of Eli Cantu.
31 RP at 4216-17.
Finally, in the State's rebuttal argument, it addressed the defense theory that Cronin committed the killing while Roberts waited outside:
The defense completely hangs their hat on that argument. They completely rely on the suggestion that perhaps, if they say it enough times, you will conclude that Mr. Roberts was in fact sitting out in a car, or you will conclude that the state wishes you to convict Mr. Roberts for a crime that he allegedly didn't know about. And I would suggest to you that if you listened closely to what [the prosecutor] said during closing argument, that's not at all what the state is asking you to do.
What we did tell you is that clearly there is evidence to convict Mr. Roberts as an accomplice to an aggravated murder as well as convict him as an accomplice to a felony/murder. There is no doubt about that.
31 RP at 4282 (emphasis added). The State then went on to argue Roberts was in fact the actual killer, but nonetheless left the door open for an alternative theory of conviction based entirely on accomplice liability.
These arguments reveal the inherent infirmities in the above jury instructions in a case such as the present one. By contrast, in Mak,
The evidence presented at trial overwhelmingly established that Mak planned, supervised and helped commit the armed robbery and systematic murder in cold blood of 13 human beings to cover up the robbery of an establishment where he was known.
Mak, 105 Wash.2d at 697, 718 P.2d 407. Mak was also present in the room during the murders because he was identified by the one surviving victim. Mak, 105 Wash.2d at 697, 718 P.2d 407. There was no doubt Mak was a major participant in the killings.
In summary, we hold when jury instructions as used in this case allow for the possibility that the defendant was convicted solely as an accomplice to premeditated first degree murder, the defendant may not be executed unless the jury expressly finds (1) the defendant was a major participant in the acts that caused the death of the victim, and (2) the aggravating factors under the statute specifically apply to the defendant.[12] Since the jury here was not instructed in this manner, we hold this to be reversible error.
3. Jury Instructions: Accomplice Liability
Roberts argues that jury instruction 7, the general accomplice liability instruction, improperly allowed the jury to convict Roberts of murder if he had general knowledge *735 of any crime, and not only the crime charged. The State argues the instruction properly states the law that a defendant with knowledge of "a crime" may be convicted as an accomplice to a greater crime that results because the defendant runs the risk that a greater crime may be committed. The State also suggests the distinction is irrelevant here because the jury by special interrogatory found Roberts acted with premeditated intent to cause the death of Eli Cantu.
Washington's accomplice liability statute provides in relevant part:
(1) A person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable.
(2) A person is legally accountable for the conduct of another person when:
. . . .
(c) He is an accomplice of such other person in the commission of the crime.

(3) A person is an accomplice of another person in the commission of a crime if:
(a) With knowledge that it will promote or facilitate the commission of the crime, he
(i) solicits, commands, encourages, or requests such other person to commit it; or
(ii) aids or agrees to aid such other person in planning or committing it....
RCW 9A.08.020 (emphasis added).
In contrast, jury instruction 7 provided in relevant part:
You are instructed that a person is guilty of a crime if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of a crime.

A person is an accomplice in the commission of a crime, whether present at the time of its commission or not, if, with knowledge that it will promote or facilitate its commission, he either:
(a) solicits, commands, encourages or requests another person to commit the crime; or
(b) aids another person in planning or committing the crime....
CP at 2654 (emphasis added). Of particular note is the above emphasized use of the phrase "a crime" in the first paragraph of instruction 7, as distinguished from the phrase "the crime" in the parallel portion of the statute, RCW 9A.08.020(2)(c).
Whether a criminal statute establishes strict liability for a crime may be determined by an examination of the statute's language and its legislative history. State v. Bash, 130 Wash.2d 594, 605, 925 P.2d 978 (1996). The language of the accomplice liability statute establishes a mens rea requirement of "knowledge" of "the crime." RCW 9A.08.020(3)(a). The statute's history, derived from the Model Penal Code, establishes that "the crime" means the charged offense. The comment to Model Penal Code ง 2.06(3)(a), which is identical to RCW 9A.08.020(3)(a), requires the accomplice to "have the purpose to promote or facilitate the particular conduct that forms the basis for the charge" and states, "he will not be liable for conduct that does not fall within this purpose." Model Penal Code ง 2.06 cmt. 6(b)(1985)(emphasis added).[13] The Legislature, therefore, intended the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has "knowledge," the mens rea of RCW 9A.08.020.[14] In *736 contrast, jury instruction 7 here essentially allowed the jury to impose strict liability on Roberts. The instruction, therefore, improperly departed from the language of the statute.
The State relies on State v. Davis, 101 Wash.2d 654, 682 P.2d 883 (1984) for the premise that "an accomplice, having agreed to participate in a criminal act, runs the risk of having the primary actor exceed the scope of the pre-planned illegality." Davis, 101 Wash.2d at 658, 682 P.2d 883. Davis presented the following question: "[w]here criminal liability for a first degree robbery is premised upon accomplice liability, must the State prove that the accomplice knew the principal was armed?" Davis, 101 Wash.2d at 655, 682 P.2d 883. This court determined no such knowledge was required. Davis, 101 Wash.2d at 658-59, 682 P.2d 883. The Davis court did not suggest, however, that the accomplice liability statute allowed conviction of an accomplice for any criminal result that occurred so long as the accomplice agreed to participate in any crime whatsoever.
Quite the contrary, the jury instruction in Davis, unlike the jury instruction here, copied exactly the language from the accomplice liability statute: it allowed for a conviction as an accomplice if the accomplice acted "`with knowledge that it will promote or facilitate the commission of the crime....'" Davis, 101 Wash.2d at 656, 682 P.2d 883 (quoting jury instruction)(emphasis added).
Moreover, in reaching its conclusion, the Davis court stated, "the question requires a determination of whether the accomplice liability statute predicates criminal liability on general knowledge of a crime or specific knowledge of the elements of the participant's crime, i.e., possession of a gun." Davis, 101 Wash.2d at 657, 682 P.2d 883 (emphasis added). This language reveals that Davis does not impose strict liability on accomplices for any and all crimes but merely reaffirms our longstanding rule that an accomplice need not have specific knowledge of every element of the crime committed by the principal, provided he has general knowledge of that specific crime. See, e.g., State v. Sweet, 138 Wash.2d 466, 479, 980 P.2d 1223 (1999)("It is not necessary for an accomplice to have specific knowledge of every element of the principal's crime."); State v. Hoffman, 116 Wash.2d 51, 104, 804 P.2d 577 (1991)("Other decisions have ... similarly concluded that the accomplice liability statute predicates criminal liability on general knowledge of the crime and not on specific knowledge of the elements of the participant's crime.").
This court clarified this distinction one year after Davis in State v. Rice, 102 Wash.2d 120, 683 P.2d 199 (1984). There, defendants Rice and Luna were both charged with second degree felony murder, with assault as the predicate offense. Interpreting its recent holding in Davis, the Rice court stated,
where criminal liability is predicated on the accomplice liability statute, the State is required to prove only the accomplice's general knowledge of his coparticipant's substantive crime. Specific knowledge of the elements of the coparticipant's crime need not be proved to convict one as an accomplice.
Rice, 102 Wash.2d at 125, 683 P.2d 199 (emphasis added)(citing Davis, 101 Wash.2d 654, 682 P.2d 883).
We adhere to the rule of Davis and Rice: an accomplice need not have knowledge of each element of the principal's crime in order to be convicted under RCW 9A.08.020. General knowledge of "the crime" is sufficient. Nevertheless, knowledge by the accomplice that the principal intends to commit "a crime" does not impose strict liability for any and all offenses that follow. Such an interpretation is contrary to the statute's plain language, its legislative history, and supporting case law.
4. Validity of the Charging Document
Roberts alleges the amended information charging him alternatively with aggravated first degree murder and first degree felony murder was defectively duplicitous. Roberts also claims the amended information was *737 multiplicitous because it charged the single crime of felony murder in two separate counts. The State contends Roberts waived any objection to the information and, regardless, the information was not duplicitous or multiplicitous.
A claim an information is duplicitous may not be raised initially on appeal. State v. Estill, 50 Wash.2d 245, 247-48, 310 P.2d 885 (1957)(citing State v. Pierson, 101 Wash. 318, 321, 172 P. 236 (1918)). Roberts failed to raise this issue below. Nonetheless, even were we to ignore this procedural defect, the information was not erroneous.
"`Duplicity' is the joining in a single count of two or more distinct and separate offenses and `multiplicity' is the charging of a single offense in several counts." State v. Noltie, 116 Wash.2d 831, 847, 809 P.2d 190 (1991). There was no multiplicity here. Contrary to Roberts' argument, the information lists only one count alleging aggravated murder in the first degree and, alternatively, felony murder. As to duplicity, we acknowledge that aggravated first degree murder and first degree felony murder are separate offenses. In re Personal Restraint of Lord, 123 Wash.2d 296, 304, 868 P.2d 835 (1994)(citing State v. Irizarry, 111 Wash.2d 591, 592-95, 763 P.2d 432 (1988)). Therefore, this information is technically duplicitous.
In Lord, however, this court approved an information nearly identical to the one here. There, the information charged Lord "in one count, with aggravated first degree murder `and/or' first degree felony murder." Lord, 123 Wash.2d at 303, 868 P.2d 835. We concluded, "[n]either separating the charges into two counts nor using `and' instead of `and/or' would have provided any additional or better notice to Lord or his attorney that Lord was accused both of felony murder and aggravated murder." Lord, 123 Wash.2d at 304, 868 P.2d 835. Lord demonstrates that a defendant must also show prejudice in order for a conviction to be reversed under the duplicity doctrine. See also United States v. Margiotta, 646 F.2d 729, 732-33 (2d Cir.1981); United States v. North, 708 F.Supp. 372, 373 (D.D.C.1988). This requirement makes sense when the foundations of the duplicity doctrine are examined:
"The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both." Furthermore, the jury cannot convict on one offense and acquit on another offense charged in the same count. Duplicity can potentially prejudice the defendant in sentencing, obtaining appellate review, and protecting himself against double jeopardy.

United States v. Washington, 127 F.3d 510, 513 (6th Cir.1997) (citations omitted)(quoting United States v. Duncan, 850 F.2d 1104, 1108 n. 4 (6th Cir.1988)); see also United States v. Zeidman, 540 F.2d 314, 316 (7th Cir.1976)(duplicity doctrine assures proper notice to defendant).
Here, Roberts alleges no lack of notice, nor does he claim any essential elements of the charged offenses are absent. Roberts also does not allege the jury rendered an improper verdict based on the duplicity of the information. Nor would such a claim be colorable, as the jury was separately instructed on first degree felony murder and aggravated murder and returned separate interrogatories finding Roberts guilty of each offense.
As Roberts failed to preserve this issue for review, and cannot show prejudice as a result of any alleged defect in the charging document, we reject Roberts' challenge to the information.
5. Appointment of Counsel of Choice
Roberts claims it was constitutional error for the trial court to deny him counsel of choice. According to Roberts, the trial court erred by denying his pro se motion to reappoint Brian Tsuchida as his lawyer when Roberts discharged his court appointed SCRAP attorneys. The State replies that an indigent defendant has no right to a specific attorney other than to prevent the arbitrary removal of counsel by the court.[15]
*738 The Sixth Amendment to the United States Constitution and article I, section 22 (amend.10) of the Washington State Constitution secure to all, by appointment if necessary, the right to assistance of counsel at any critical stage in a criminal prosecution. State v. Valentine, 132 Wash.2d 1, 16, 935 P.2d 1294 (1997)(citing Coleman v. Alabama, 399 U.S. 1, 7, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970); Heinemann v. Whitman County, 105 Wash.2d 796, 799-800, 718 P.2d 789 (1986)). The chief purpose of this right is to provide all defendants with a fair trial. Wheat v. United States, 486 U.S. 153, 158-59, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988).
Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.
Wheat, 486 U.S. at 159, 108 S.Ct. 1692; see also State v. Stenson, 132 Wash.2d 668, 733, 940 P.2d 1239 (1997)("A defendant does not have an absolute, Sixth Amendment right to choose any particular advocate.")(citing State v. DeWeese, 117 Wash.2d 369, 375-76, 816 P.2d 1 (1991)).
The right to counsel does include a limited right to counsel of choice. E.g., United States v. Washington, 797 F.2d 1461, 1465 (9th Cir.1986)("It is settled law that under the Sixth Amendment criminal defendants `who can afford to retain counsel have a qualified right to obtain counsel of their choice.'" (emphasis added)(quoting United States v. Ray, 731 F.2d 1361, 1365 (9th Cir. 1984))). However, "a defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." Wheat, 486 U.S. at 159, 108 S.Ct. 1692 (detailing limitations on right to select counsel); see also Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989); United States v. Rogers, 984 F.2d 314, 316 (9th Cir.1993). Here, both of these factors came into play. Roberts could not afford to hire Brian Tsuchida, who was appointed at the State's expense. Furthermore, both Brian Tsuchida and his office declined to represent Roberts due to a heavy case load. Brian Tsuchida was already counsel on another capital case.
The trial court's disposition of Roberts' motion to substitute counsel was hardly arbitrary. The court evaluated Roberts' inability to work with his SCRAP attorneys and allowed for the appointment of new counsel to be determined by OPD. If anything, it would have been arbitrary and perhaps unethical for the trial court to force the case onto Brian Tsuchida. Finally, the court's decision did not disrupt a relationship between Roberts and Tsuchida; Roberts' case was reassigned after two days and there is no indication Roberts and Tsuchida even communicated about the case.
We hold the trial court's decision provided Roberts with competent representation and his right to counsel was, therefore, not violated.[16]
6. Denial of Challenges for Cause
Roberts assigns error to the trial court's denial of Roberts' challenges for cause against 13 jurors, 4 of whom were actually seated in the jury box (but then removed by defense peremptory challenges). Roberts claims the trial court's erroneous denials of challenges for cause forced the defense to prematurely exhaust its allotted peremptories. The State claims the challenges for cause at issue were properly denied, the exhaustion of peremptories alone is not prejudicial, *739 and, furthermore, Roberts also declined the trial court's offer of extra peremptories.
Under the Sixth Amendment to the United States Constitution and article I, section 22 (amend.10) of the Washington State Constitution, "a defendant is guaranteed the right to a fair and impartial jury." State v. Brett, 126 Wash.2d 136, 157, 892 P.2d 29 (1995)(citing State v. Rupe, 108 Wash.2d 734, 748, 743 P.2d 210 (1987)). A juror may be excused for cause when his views "`prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Brett, 126 Wash.2d at 157, 892 P.2d 29 (quoting State v. Hughes, 106 Wash.2d 176, 181, 721 P.2d 902 (1986)). A trial court's denial of challenges for cause is reviewed under an abuse of discretion standard. Brett, 126 Wash.2d at 158, 892 P.2d 29 (citing Rupe, 108 Wash.2d at 748, 743 P.2d 210).
It is well established that an erroneous denial of a challenge for cause may be cured when the challenged juror is removed by peremptory. United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 777-80, 145 L.Ed.2d 792 (2000); Ross v. Oklahoma, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); Rupe, 108 Wash.2d at 749, 743 P.2d 210 (citing State v. Latham, 100 Wash.2d 59, 64, 667 P.2d 56 (1983)).
Here, Roberts not only used his peremptories to remove the four seated jurors he unsuccessfully challenged for cause but also turned down the trial court's offer of two extra peremptories. Cf. Rupe, 108 Wash.2d at 749, 743 P.2d 210 (no error when defendant was granted two extra peremptories and used them to strike two jurors he unsuccessfully challenged for cause). "So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." Ross, 487 U.S. at 88, 108 S.Ct. 2273; see also Martinez-Salazar, 120 S.Ct. at 782 (rejecting due process challenge under same scenario).
We hold because Roberts has not demonstrated that jurors who should have been removed for cause actually sat on the panel, his rights were not violated.
7. Dismissal of Jurors
Roberts challenges the trial court's dismissal of several jurors. In particular, Roberts claims it was error to dismiss jurors Endicott and Schau without providing the defense with a chance to voir dire. Roberts also alleges error in the process by which juror Pechman was discharged and the trial court's dismissal of jurors Walker and Stepper after earlier denying defense challenges for cause against them. According to Roberts, because of these errors the trial court should have granted the defense motion to strike the jury panel. The State counters that these jurors were all properly dismissed and, therefore, the motion to strike was rightly denied.
Under our state statutes, members of the jury panel must be randomly selected. E.g., RCW 2.36.010(12), .063, .065; State v. Tingdale, 117 Wash.2d 595, 600 & n. 3, 817 P.2d 850 (1991); Brady v. Fibreboard Corp., 71 Wash.App. 280, 282, 857 P.2d 1094 (1993). "Where the selection process is in substantial compliance with the statutes, the defendant must show prejudice. If there has been a material departure from the statutes, prejudice will be presumed." Tingdale, 117 Wash.2d at 600, 817 P.2d 850 (citing W.E. Roche Fruit Co. v. N. Pac. R. Co., 18 Wash.2d 484, 139 P.2d 714 (1943)). A trial court's decision to excuse members of the jury venire is reviewed under an abuse of discretion standard. Tingdale, 117 Wash.2d at 599-600, 817 P.2d 850. Challenges to the jury panel shall be sustained only upon a material departure from the procedures provided by law. CrR 6.4(a).
Roberts points to no requirement that the parties each be allowed to conduct their own voir dire of every prospective juror. The court rules state both the judge and counsel "may ... ask the prospective jurors questions ..., subject to the supervision of the court as appropriate to the facts of the case." CrR 6.4(b)(emphasis added); see also Lord, 123 Wash.2d at 308, 868 P.2d 835 (suggesting voir dire may be conducted by the parties or the court). CrR 6.4(c)(1) *740 further provides, "[i]f the judge after examination of any juror is of the opinion that grounds for challenge are present, he shall excuse the juror from the trial of the case."
Here, the trial judge dismissed juror Endicott after he conclusively stated he could not apply the death penalty regardless of the facts or circumstances. Juror Endicott could have been removed for cause and was, therefore, justifiably dismissed by the court. CrR 6.4(c)(1); Mak, 105 Wash.2d at 707, 718 P.2d 407 (trial court does not abuse its discretion by excusing jurors who cannot enforce the death penalty)(citing State v. Jeffries, 105 Wash.2d 398, 411, 717 P.2d 722 (1986); State v. Leuch, 198 Wash. 331, 335-37, 88 P.2d 440 (1939)). The same can be said for juror Walker, who indicated he could not conceive of a situation wherein he would apply the death penalty, and that the death penalty is not appropriate when there is only one victim. Juror Schau, a school principal, was removed for hardship. See RCW 2.36.100(1). Roberts himself challenged juror Stepper for cause and, thus, may not complain about that juror's removal from the jury. See Jeffries, 105 Wash.2d at 411, 717 P.2d 722. Jurors Endicott, Walker, Schau, and Stepper were properly dismissed.
The process by which juror Pechman was discharged was admittedly irregular. The trial judge apparently believed both parties assented to the dismissal of juror Pechman, who at the time was a superior court judge. When the trial court realized the defense wished to retain juror Pechman, it filed an order treating her dismissal as one of the State's peremptory challenges. Roberts has shown no prejudice due to Pechman's dismissal and prejudice should not be presumed because the trial court's actions substantially complied with the relevant statutory procedures. Tingdale, 117 Wash.2d at 600, 817 P.2d 850.
We hold the trial court did not abuse its discretion in dismissing the above jurors, nor did it ultimately abuse its discretion in declining to strike the jury panel.
8. Admissibility of "Blood Splatter" Testimony
Roberts argues the testimony of Washington State Crime Lab forensic scientist Kerstin Gleim was improperly admitted under both the Frye[17] standard and ER 702 and ER 703.[18] The State contends Frye is not applicable because Gleim's testimony did not encompass any novel scientific theories and, therefore, the trial judge did not abuse his discretion by admitting the testimony under ER 702.
A trial court's decision to admit expert testimony under the Frye test is reviewed de novo; a decision to admit expert testimony under ER 702 and ER 703 is reviewed for abuse of discretion. State v. Baity, 140 Wash.2d 1, 9-10, 991 P.2d 1151 (2000)(citing State v. Cauthron, 120 Wash.2d 879, 887, 846 P.2d 502 (1993); State v. Ortiz, 119 Wash.2d 294, 308, 831 P.2d 1060 (1992)).
Evidence that does not involve "new methods of proof or new scientific principles" is not subject to examination under Frye. Baity, 140 Wash.2d at 10, 991 P.2d 1151. "Blood splatter" analysis, which Gleim testified on, hardly qualifies as a novel scientific technique. Many jurisdictions have held blood splatter analysis either meets the Frye standard or does not implicate it at all. See generally People v. Clark, 5 Cal.4th 950, 857 P.2d 1099, 22 Cal.Rptr.2d 689 (1993) (Frye test not implicated by blood splatter testimony); State v. Moore, 458 N.W.2d 90, 96-98 (Minn.1990); State v. Hall, 297 N.W.2d 80, 85 (Iowa 1980); Lewis v. State, 737 S.W.2d 857, 861 (Tex.Ct.App.1987); People v. Knox, 121 Ill.App.3d 579, 76 Ill. *741 Dec. 942, 459 N.E.2d 1077 (1984); see also Danny R. Veilleux, Admissibility, in Criminal Prosecution, of Expert Opinion Evidence as to "Blood Splatter" Interpretation, 9 A.L.R.5th 369, งง 5-6 (1993 & Supp.1999). Blood splatter testimony is not a new method of scientific proof and, therefore, need not be subjected to the Frye analysis. Baity, 140 Wash.2d at 10, 991 P.2d 1151. Even if it were, there is little doubt such testimony is now generally accepted in the scientific community. Thus, under Frye this testimony was properly admitted.
We must, therefore, inquire whether the trial court abused its discretion by admitting the testimony under ER 702 and ER 703. Expert testimony is admissible under ER 702 if the witness qualifies as an expert and the testimony would be helpful to the trier of fact. Baity, 140 Wash.2d at 18, 991 P.2d 1151 (citing Cauthron, 120 Wash.2d at 889-90, 846 P.2d 502). Roberts does not challenge Gleim's credentials as an expert but, instead, suggests the testimony was not helpful to the jury because Gleim did not visit the crime scene.
Blood splatter testimony has been admitted in other jurisdictions under analogous rules of evidence. See, e.g., State v. Lee, 189 Ariz. 608, 944 P.2d 1222 (1997); King v. State, 531 N.E.2d 1154, 1157 (Ind. 1988); Pedersen v. State, 420 P.2d 327, 335 (Alaska 1966); State v. Proctor, 94 Or.App. 720, 767 P.2d 453 (1989); Farris v. State, 670 P.2d 995, 997 (Okla.Crim.App.1983); State v. Satterfield, 3 Kan.App.2d 212, 592 P.2d 135 (1979); Veilleux, supra, 9 A.L.R.5th 369, ง 3.
As with the present case, in several prior cases blood splatter experts did not actually view the crime scene but, as here, testified based on photographic evidence. See Lee, 944 P.2d at 1228; King, 531 N.E.2d at 1157; Satterfield, 592 P.2d at 140-41. In Proctor, a novel method of blood collection was used but the Oregon Court of Appeals nonetheless admitted the testimony; it found the novelty of the technique went to the weight of the evidence and not its admissibility. Proctor, 767 P.2d at 455.
We reach the same conclusion here. Although Gleim did not travel to the crime scene, she personally viewed photographs and a videotape of the scene. She also examined the victim's clothing and the chair in which the victim was discovered. Gleim based her testimony on these personal observations.
The trial court did not abuse its discretion by admitting this testimony into evidence.
9. Admissibility of DNA Testing
Roberts argues the method of DNA testing utilized in this case does not satisfy the Frye test and was improperly admitted into evidence under ER 702. The State counters that both the theory of DNA testing and the methodology employed here satisfy Frye, and any alleged deficiencies in the DNA testing are more properly analyzed under ER 702.
"There is no question that the underlying scientific theory of DNA typing is accepted in the scientific community for identification purposes in the forensic setting." State v. Gentry, 125 Wash.2d 570, 586, 888 P.2d 1105 (1995). This court has twice ruled that the polymerase chain reaction (PCR) variation of DNA testing, utilized by Dr. Bing in this case, is an appropriate technique to implement the theory of DNA identification. Gentry, 125 Wash.2d at 587, 888 P.2d 1105; State v. Russell, 125 Wash.2d 24, 54, 882 P.2d 747 (1994); see also State v. Jones, 130 Wash.2d 302, 307, 922 P.2d 806 (1996)(issues including laboratory error more properly addressed by ER 702 and weight of the evidence, and not Frye); State v. Copeland, 130 Wash.2d 244, 272-77, 922 P.2d 1304 (1996)(same). Our precedent vindicates the State's contention that the tests performed by Dr. Bing are more properly considered under ER 702 than under Frye.
In this case, the trial court carefully considered the admissibility of Dr. Bing's DNA testing. The court heard testimony not only from Dr. Bing but also from two defense experts regarding the reliability of the testing procedures. The court concluded the amount of DNA extracted from the stain on Roberts' shoe was within the acceptable protocols for use of the Quantiblot DNA kit. The trial court also noted although the defense *742 alleged the tests were contaminated, it offered no direct evidence to rebut Dr. Bing's testimony that no contamination occurred. See CP at 2445, 2953.
Essentially, the trial court faced a dispute between experts about the reliability of the test conducted. Dr. Bing, who testified for the State, opined that the test produced results reliable enough to at least conclude human DNA was present within the stain on Roberts' shoe. On the other hand, Dr. Randell Libby, who testified for the defense, suggested the results were unreliable and could not establish the stain was human blood.[19] In Gentry, this court stated:
The criticisms of the test in this particular case, such as whether the proper procedures were carried out, whether the lab notes were adequate, whether the number of amplifications conformed to the laboratory protocol, are questions regarding whether this particular test was properly conducted and hence go to the issue of weight, not admissibility. They were therefore properly submitted to the jury. As we have previously explained, human error in the forensic laboratory will continue to be a relevant inquiry. However, the trial court is best suited to address such factual matters. Once PCR evidence is determined to be generally accepted, as it has been, then both proponents and opponents of a particular test should be able to garner the necessary information to present both sides of the issue of whether errors were committed in a given test to the factfinder when there is a challenge to the validity of a laboratory procedure. That is precisely what occurred in this case. The jury heard knowledgeable scientists for both the State and the defense testify at length on the issue of the validity of these particular tests. We find no error in the trial court's decision to allow the evidence concerning the PCR method of testing DNA to go to the jury.
Gentry, 125 Wash.2d at 588-89, 888 P.2d 1105 (footnote omitted)(emphasis added). This analysis compels the same conclusion in the present case. Here, as in Gentry, the PCR variation of DNA testing was used and both the State and the defense presented expert testimony on the manner in which the tests were conducted.
The trial court did not abuse its discretion by admitting this testimony into the record and allowing the jury to assign the proper weight to the test results.
10. Proposed Lesser Included and Inferior Degree Jury Instructions
Roberts asserts the trial judge improperly denied his request for the jury to be instructed on the lesser offense of felony murder in the second degree, based upon the predicate offenses of unlawful imprisonment or theft in the first degree.[20] The State counters that the factual evidence was insufficient to justify the giving of a second degree felony murder jury instruction.
An inferior degree jury instruction is appropriate when, "(1) the statutes for both the charged offense and the proposed inferior degree offense `proscribe but one offense'; (2) the information charges an offense that is divided into degrees, and the proposed offense is an inferior degree of the charged offense; and (3) there is evidence that the defendant committed only the inferior offense." State v. Peterson, 133 Wash.2d 885, 891, 948 P.2d 381 (1997) (citing State v. Foster, 91 Wash.2d 466, 472, 589 P.2d 789 (1979); State v. Daniels, 56 Wash.App. 646, 651, 784 P.2d 579 (1990)); see also RCW 10.61.003.
A lesser included jury instruction may be given when "first, each of the elements of the lesser offense [is] a necessary element of the offense charged; [and] second, the evidence in the case must support an inference that the lesser crime was committed." State v. Berlin, 133 Wash.2d 541, 548, 947 P.2d 700 (1997)(emphasis omitted) *743 (citing State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978)); see also RCW 10.61.006.
This court has upheld trial court decisions to refuse jury instructions on second degree murder when the facts of the case show "`[i]t was either murder in the first degree, or nothing.'" State v. Biondic, 47 Wash.2d 593, 595, 288 P.2d 845 (1955)(quoting State v. Much, 156 Wash. 403, 410, 287 P. 57 (1930)); see also State v. Ortiz, 119 Wash.2d 294, 313-14, 831 P.2d 1060 (1992). This rule has been applied when the evidence clearly establishes that the murder was committed in the course of a felony that would serve as a predicate for a charge of felony murder in the first degree.
"Where the undisputed evidence in a murder case shows the crime to have been committed in the course of a felony enumerated in [the first degree felony murder statute],... the trial court will only instruct on the highest degree of the crime." Proll v. Morris, 85 Wash.2d 274, 276, 534 P.2d 569 (1975)(citing Biondic, 47 Wash.2d 593, 288 P.2d 845; State v. Whitfield, 129 Wash. 134, 141, 224 P. 559 (1924)); accord Ortiz, 119 Wash.2d at 313-14, 831 P.2d 1060 (evidence that crime of rape was committed defeats factual inquiry for lesser included offense); State v. Peyton, 29 Wash.App. 701, 714-15, 630 P.2d 1362 (when the evidence establishes a killing was committed in the course of a first degree felony murder predicate crime, "the trial court need not instruct on lesser offenses, even as to coparticipants" (emphasis added)), review denied, 96 Wash.2d 1024 (1981).
In Peyton, six defendants robbed a Tacoma bank. Four of the defendants, including Peyton, fled the scene in an automobile. A deputy sheriff was killed while chasing these four defendants. The State argued Peyton fired the fatal shot, but all of the defendants were tried and convicted under a theory of first degree felony murder. Peyton, 29 Wash.App. at 704-05, 630 P.2d 1362. At trial, four of the six defendants urged the trial court to instruct the jury based on second degree murder. The trial court declined this invitation and the Court of Appeals affirmed, holding, "RCW 9A.32.030(1)(c) includes homicide while a defendant or his accomplices are in flight from a robbery." Peyton, 29 Wash.App. at 715, 630 P.2d 1362.
This analysis is equally applicable here. RCW 9A.32.030(1)(c) includes homicide committed in the course of a robbery or kidnapping. While Roberts asserts the evidence supports at least an inference that he was merely an accomplice to the lesser crimes of theft in the first degree or unlawful imprisonment, this claim is without merit.
First degree theft is committed by wrongfully obtaining property in excess of $1,500. RCW 9A.56.020(1), .030(1)(a). Robbery, in contrast, involves the taking of property from another, in the victim's presence, by force or threat of force. RCW 9A.56.190, .200, .210. No inference that theft rather than robbery was committed may be drawn from the facts of this case. Cantu was tied to a chair, strangled, and stabbed. Clearly the requisite force or threat of force was present to dispel any claim that first degree theft, and not robbery, was committed.
The same may be said of any claims regarding unlawful imprisonment. "A person is guilty of unlawful imprisonment if he knowingly restrains another person." RCW 9A.40.040(1). "Restraint" means restricting "a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty." RCW 9A.40.010(1). Restraint may involve the use of physical force. RCW 9A.40.010(1)(a). Kidnapping, on the other hand, involves the intentional abduction of the victim. RCW 9A.40.020, .030. "Abduction" means restraint when deadly force is threatened or used against the victim. RCW 9A.40.010(2)(b). Again, because Cantu was bound, asphyxiated, and impaled, the facts of this case do not support the lesser offense of unlawful restraint but fall squarely within the definition of kidnapping.
The evidence herein does not support the inference that either unlawful restraint or theft was committed. As a result, Roberts cannot satisfy the factual prong of the lesser included and lesser degree tests. Berlin, 133 Wash.2d at 548, 947 P.2d 700; Peterson, 133 *744 Wash.2d at 891, 948 P.2d 381. Roberts was, therefore, not entitled to a jury instruction on felony murder in the second degree based on the predicate offenses of unlawful restraint or theft in the first degree.
The trial court properly denied Roberts' request for proposed lesser included and inferior degree jury instructions.
11. Admissibility of Prior Canadian Convictions
Roberts argues the trial court improperly admitted his prior Canadian convictions into evidence during the penalty phase. Roberts argues such convictions were constitutionally and statutorily inadmissible. The State counters that the burden is on Roberts to demonstrate the convictions are unreliable or fundamentally unfair and because he did not do so the convictions were properly admitted.
During the penalty phase of a capital proceeding, the jury may consider "any relevant factors, including but not limited to ... [w]hether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity...." RCW 10.95.070(1). However, this broad language is subject to constitutional limitations. State v. Pirtle, 127 Wash.2d 628, 666, 904 P.2d 245 (1995). The admission of "any relevant factors" applies to mitigating factors only. Pirtle, 127 Wash.2d at 666, 904 P.2d 245 (citing Bartholomew II, 101 Wash.2d at 642, 683 P.2d 1079). "[E]vidence of nonstatutory aggravating factors must be limited to defendant's criminal record, evidence that would have been admissible at the guilt phase, and evidence to rebut matters raised in mitigation by the defendant." Pirtle, 127 Wash.2d at 666, 904 P.2d 245 (quoting Bartholomew II, 101 Wash.2d at 642, 683 P.2d 1079). To establish a defendant's criminal history, "adjudications of guilt" may be admitted, while "mere allegations or charges not resulting in convictions" are inadmissible. Pirtle, 127 Wash.2d at 668-69, 904 P.2d 245 (emphasis omitted) (citing Bartholomew II, 101 Wash.2d at 641, 683 P.2d 1079). The dispositive inquiry is whether the prior adjudication is "sufficiently reliable to warrant admission." Pirtle, 127 Wash.2d at 669, 904 P.2d 245.
Roberts has an extensive criminal history in Canada. In 1974, he was convicted of theft, fraud, willful damage and mischief, and possession of stolen property. Later that year, he was convicted of robbery with threat of violence, breaking and entering, and arson. In 1978, Roberts pleaded guilty to armed robbery and attempted murder. In 1984, Roberts pleaded guilty to second degree murder. In 1990, Roberts was convicted on charges relating to a 1988 prison escape.
In each of these cases, Roberts was represented by counsel. According to the prosecuting attorneys from Roberts' attempted murder and second degree murder proceedings, as a Canadian citizen Roberts had the following rights: to be represented by counsel, to be informed of the specific charge against him, to be tried by a 12-person jury, to confront witnesses, to remain silent, and to refuse to offer testimony. After entry of his pleas in those cases, Roberts also retained the right to appeal the plea and, in fact, did appeal the attempted murder plea which was affirmed by the Court of Appeals of New Brunswick. Due to this full panoply of rights, as well as Roberts' documented representation by counsel during these proceedings, the trial judge found the Canadian convictions satisfied the reliability requirements of Bartholomew II and Pirtle and admitted them into evidence at the penalty phase.
Roberts suggests unless the State affirmatively establishes the constitutional validity of the Canadian convictions, they may not be admitted. We have rejected similar arguments in several circumstances. See, e.g., State v. Manussier, 129 Wash.2d 652, 681-84, 921 P.2d 473 (1996)(State need not affirmatively establish validity of prior convictions under "three strikes" initiative); Young, 122 Wash.2d at 54, 857 P.2d 989 (same under sexually violent predators act); In re Personal Restraint of Harris, 111 Wash.2d 691, 696-97, 763 P.2d 823 (1988) (same in penalty phase of aggravated murder trial); State v. Ammons, 105 Wash.2d 175, 187, 713 P.2d 719, 718 P.2d 796 (1986)(same under Sentencing Reform Act of 1981, chapter 9.94A RCW).
*745 Although Roberts correctly argues the use of foreign convictions in capital sentencing proceedings must be closely scrutinized, the record here demonstrates the trial court performed such close scrutiny. See, e.g., Pirtle, 127 Wash.2d at 666, 904 P.2d 245; Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). More than 200 pages of documentation were submitted detailing the Canadian convictions. Roberts does not claim he never committed the Canadian offenses, that he was not represented by counsel, or that any specific constitutional infirmities plagued those convictions. Roberts rather asserts there has been no affirmative showing he was specifically informed of all the rights detailed above. Even were this true, the Canadian convictions would presumably still be admissible. See Custis v. United States, 511 U.S. 485, 496-97, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994)(while denial of counsel renders a prior conviction per se invalid for sentencing purposes, other alleged errors, including involuntary plea, do not). Custis makes the same point this court made in Ammons: absent facial constitutional invalidity or an affirmative showing of infirmity by the defendant, the sentencing court should not be forced to conduct an appellate review of each of the defendant's priors. Custis, 511 U.S. at 496, 114 S.Ct. 1732; Ammons, 105 Wash.2d at 188, 713 P.2d 719.
Roberts' Canadian convictions appear, from the well developed record, to be reliable, to have afforded Roberts counsel, and to be free of any facial constitutional defects. We hold because Roberts has offered no specific reasons why the Canadian convictions were constitutionally defective or unreliable, the convictions were properly admitted under RCW 10.95.070(1) and our holdings in Bartholomew II and Pirtle.
12. Acquisition of Canadian Records under Canadian Law and the Mutual Legal Assistance Treaty
Roberts asserts the State obtained his Canadian prison records under false pretenses by not informing the Canadian government it intended to use the records not merely to convict Roberts but also to impose a death sentence. Roberts claims the State's actions violated of Canada's Privacy Act (Privacy Act) and the Treaty Between the Government of Canada and the Government of the United States of America on Mutual Legal Assistance in Criminal Matters (the Treaty) and, therefore, amounted to prosecutorial misconduct. The State responds that Canada was fully aware Roberts was facing the death penalty, that Roberts' records were properly released under Canadian law and, even were this not the case, the Treaty expressly states that individuals may not use rights the treaty provides as a basis to suppress evidence.
The State's request for Roberts' records, pursuant to the terms of the Treaty, was submitted through the United States Department of Justice. The request begins: "The King County Prosecuting Attorney in Seattle, Washington, is prosecuting the defendants Timothy Cronin and Michael Roberts for murdering Eli Cantu in Seattle, Washington, on May 6, 1994." CP at 2159. The request then lists the offenses of which Roberts is accused, and quotes the relevant Washington statutes. Among the statutes quoted are the aggravated murder statute, RCW 10.95.020, and the capital sentencing statute which, in particular, states if sufficient mitigating circumstances are not found, "the sentence shall be death...." CP at 2163 (quoting RCW 10.95.030(2)). In closing, the request states that the State of Washington requires the assistance of the Canadian government "to convict the defendants of the aggravated murder of Eli Cantu...." CP at 2165. It is hard to imagine how this document failed to inform the Canadian government that both Roberts and Cronin faced the prospect of a death sentence.
Furthermore, the Canadian Department of Justice honored the State of Washington's request because it determined the request complied fully with Canadian law and, in particular, both the terms of the Treaty and the Privacy Act. In a letter to the United States Department of Justice, counsel for the Canadian Department of Justice International Assistance Group stated:

*746 The request was complied with in accordance with the terms of the [Mutual Legal Assistance] Treaty and Canadian law....
Further, the nature of the prosecution in the United States and the ultimate penalty which may be imposed in the United States upon conviction do not bear on Canada's decision as to whether to execute the request for assistance or not.
CP at 2179.
In particular, the Canadian government concluded the State's request was validly honored under section 8(2)(f) of the Privacy Act, which states:
Subject to any other Act of Parliament, personal information under the control of a government institution may be disclosed.
(f) under an agreement or arrangement between the Government of Canada or an institution thereof and the government of a province, the government of a foreign state, an international organization of states or an international organization established by the government of states, or any institution of any such government or organization, for the purpose of administering or enforcing any law or carrying out a lawful investigation....
CP at 2179 (quoting Privacy Act, R.S.Q., ch. P 21, ง 8(2)(f)(1980-1983)(Can.)) (emphasis added).
Finally, the Treaty itself states:
"This Treaty is intended solely for mutual legal assistance between the Parties. The Provisions of this Treaty shall not give rise to a right on the part of a private party to obtain, suppress, or exclude any evidence or to impede the execution of a request." CP at 2132 (quoting Treaty, art. II, ง 4).
"In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." United States v. Alvarez-Machain, 504 U.S. 655, 663, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992)(citing Air France v. Saks, 470 U.S. 392, 397, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985); Valentine v. United States ex rel. Neidecker, 299 U.S. 5, 11, 57 S.Ct. 100, 81 L.Ed. 5 (1936)). "`The clear import of treaty language controls unless "application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories."'" United States v. Stuart, 489 U.S. 353, 365-66, 109 S.Ct. 1183, 103 L.Ed.2d 388 (1989)(quoting Sumitomo Shoji Am., Inc. v. Avagliano, 457 U.S. 176, 180, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982)).
Roberts argues he may, nevertheless, exclude evidence obtained in violation of the Treaty. Roberts relies on several cases involving treaties "intended to protect individual rights...." Appellant's Opening Br. at 182 (citing inter alia El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng, 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999); Asakura v. City of Seattle, 265 U.S. 332, 44 S.Ct. 515, 68 L.Ed. 1041 (1924); United States v. Noriega, 808 F.Supp. 791 (S.D.Fla.1992)). From its plain language, however, the Treaty is not a treaty intended to protect individual rights, but a treaty to aid in criminal investigations. Treaty, Preamble ("Desiring to improve the effectiveness of both countries in the investigation, prosecution, and suppression of crime...."). CP at 2131. Roberts' cases are not applicable here.
We hold the State's acquisition of Roberts' records complied with Canadian law and with the requirements of the Treaty. We further hold the Treaty, by its express terms, may not serve as a basis for the suppression of evidence. We, therefore, conclude Roberts' allegations of prosecutorial misconduct based on violations of the Treaty and Canadian law are unfounded.
13. Cross-examination of Dr. Randell Libby
Roberts alleges the State committed misconduct during its cross-examination of Dr. Randell Libby when it inquired if defense attorney Peter Connick had once represented Dr. Libby in an Oregon court proceeding. The State claims no misconduct occurred because the question was designed to establish the witness' bias, the State had a good faith basis to ask the question, and the trial court cured any prejudice by sustaining a defense objection and instructing the jury to disregard the question.
*747 To prevail on a claim of prosecutorial misconduct, the defendant must show both improper conduct by the prosecutor and prejudicial effect. Pirtle, 127 Wash.2d at 672, 904 P.2d 245 (citing State v. Furman, 122 Wash.2d 440, 455, 858 P.2d 1092 (1993)). "Prejudice is established only if there is a substantial likelihood the instances of misconduct affected the jury's verdict." Pirtle, 127 Wash.2d at 672, 904 P.2d 245 (citing State v. Evans, 96 Wash.2d 1, 5, 633 P.2d 83 (1981)).
According to the State, the question at issue was asked of Dr. Libby to elicit his "very close relationship" with defense counsel. The basis for the question was a letter written by defense counsel indicating he represented Dr. Libby in an Oregon perjury case. The State wished to introduce this information in conjunction with Dr. Libby's testimony that he had testified between 45 and 50 times as a defense expert in various cases. The trial court agreed with defense counsel that the question at issue was collateral and sustained defense counsel's objection, but denied the defense motion for a mistrial.
A trial court's denial of a motion for a mistrial is reviewed for abuse of discretion. State v. Lewis, 130 Wash.2d 700, 707, 927 P.2d 235 (1996), see also State v. Luvene, 127 Wash.2d 690, 704, 903 P.2d 960 (1995)(noting the "high degree of deference" paid to trial court in its decision to deny a mistrial for prosecutorial misconduct). A trial court "should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." Lewis, 130 Wash.2d at 707, 927 P.2d 235 (citing State v. Johnson, 124 Wash.2d 57, 76, 873 P.2d 514 (1994)).
Here, the trial court did not let the objectionable material into evidence but, instead, instructed the jury to disregard it. The trial court observed the jurors following this instruction and was satisfied they would follow it. See also Russell, 125 Wash.2d at 84, 882 P.2d 747 (jurors are presumed to follow instructions to disregard improper evidence)(citing State v. Swan, 114 Wash.2d 613, 661-62, 790 P.2d 610 (1990)). Despite the obvious significance of Dr. Libby's testimony, even assuming the question was improper Roberts has not established that this lone question substantially influenced the verdict of the jury or that the trial court abused its discretion in concluding Roberts could still receive a fair trial.

CONCLUSION
In light of the above analysis, we do not reach the remaining assignments of error. Roberts' first degree felony murder conviction is affirmed. His aggravated premeditated first degree murder conviction is reversed, and the sentence of death is vacated. The case is remanded for further proceedings consistent with this opinion.
GUY, C.J., SMITH, MADSEN, ALEXANDER, and SANDERS, JJ., concur.
IRELAND, J. (dissenting).
I dissent from the majority opinion on the issues of (1) the admissibility of Timothy Cronin's hearsay statement; and (2) the jury instruction regarding aggravating factors. As a result, I would affirm the conviction and sentence of Michael Kelly Roberts for first degree aggravated murder.
1. Admissibility of Cronin's Statement
Roberts sought admission of his codefendant's tape-recorded statement to the police under the statement against interest exception to the hearsay rule. In the statement, Cronin denied committing the murder or being present when it occurred.
The statement against interest hearsay exception provides:
A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating *748 circumstances clearly indicate the trustworthiness of the statement.

ER 804(b)(3) (emphasis added).
In determining the reliability or trustworthiness of out-of-court declarations, the court considers the following factors:
(1) Whether the declarant had an apparent motive to lie; (2) whether the general character of the declarant suggests trustworthiness; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously;... (5) whether the timing of the statements and the relationship between the declarant and the witness suggest trustworthiness; [6] whether the statements contained express assertions of past fact; [7] whether cross examination could not help to show the declarant's lack of knowledge; [8] whether the possibility of the declarant's recollection being faulty is remote; and [9] whether the circumstances surrounding the statements give no reason to suppose that the declarant misrepresented the defendant's involvement.
State v. Anderson, 107 Wash.2d 745, 750, 733 P.2d 517 (1987) (citations omitted).
The trial court considered these factors and concluded that Roberts did not establish that the hearsay statement was trustworthy. The trial judge ruled as follows:
The statements to Detectives Peters and Hatch are also made in a context in which the declarant, Mr. Cronin, is serving what are perceived as beneficial motivations to himself rather than confessing to a crime to expiate the soul or intentionally expose himself to liability.
The thrust of the statement is, as would be seen by an individual in Mr. Cronin's circumstances, exculpatory to the extent that he is denying any role whatsoever in the causing of Mr. Cantu's death. It is certainly necessary for him in that context to admit limited responsibility in various crimes along the way, some of which he was videotaped committing, others of which he was in possession of stolen property evidencing. It would be absolutely necessary in that context for him to retain any credibility in the assertions of innocence as to the most serious charge of causing the death of Mr. Cantu. So the circumstances are not such as would permit the court to find sufficient trustworthiness to those aspects of the statement in which the defense would be most interested.
4 Verbatim Report of Proceedings (RP) at 290-91.
The majority takes issue with the trial court's ruling: "The trial court, therefore, unnecessarily took an all or nothing approach to what constituted Cronin's statement, thereby saddling itself with the almost impossible task of determining whether the entirety of a 45-page confession was either inculpatory or exculpatory." Majority at 728. The majority proposes adoption of the Williamson rule (Williamson v. United States, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)) which "requires the federal courts to examine a proffered hearsay narrative, separate the inculpatory portions from those that are self-serving, and redact the narrative to exclude the self-serving statements." Majority at 726.
The State argues the wisdom of adopting the Williamson rule as a general rule of evidence because the issue in that case was whether an entire narrative was properly admitted, not whether portions of a statement were properly excluded. However, the majority claims the definition of "statement" should not change depending on which party offers a statement. While strictly speaking this may be true, the context in which the evidence is offered and who is the proponent does make a difference to admissibility. The majority also states that Cronin's confession was improperly excluded on reliability grounds because the same trial judge admitted the confession at Cronin's separate trial. This ignores the fact that reliability is not at issue when the State offers a statement against a party opponent, as in Cronin's trial. ER 801(d)(2). However, the context shifts to a hearsay analysis when the statement of an unavailable witness (Cronin) is offered by a codefendant (Roberts), and a reliability finding is then required.
While the wisdom of adopting Williamson might be further debated, it is entirely *749 unnecessary in this case because the judge did not make a particularized examination of the statement in its parts as well as its whole. The majority entirely overlooks the following discussion by the trial judge:
The question of admissibility of a statement against penal interest, particularly when offered by the defense, is, but really in all circumstances, is really one of the most fact-based of any evidentiary ruling that the court is asked to make. There needs to be an absolute focus upon the context in which the statement is made by the out-of-court declarant in order to determine whether or not there is sufficient trustworthiness to allow its admission in the courtroom without the opposing party having the opportunity to confront or cross-examine that declarant.
The question then is whether or not the offered statement is a clear assertion of past fact made under circumstances where there is not a motivation to lie. The court is absolutely unable to find anything in the circumstances regarding these proffered statements that would put them into or even close to being in that category....
The statements made to the detectives were similarly guided by self-serving motivations. He [Cronin] was charged or was implicated in this homicide and had a strong motivation to distance himself from the actual causing of Mr. Cantu's death.
In Mr. Holt's opening statement on behalf of Mr. Roberts, he asserted before the jury that while Mr. Roberts was present at the scene beforehand, the stabbing and strangling of Mr. Cantu were done by a single person. That person was Timothy Cronin. That was an argument advanced by counsel on behalf of Mr. Roberts that was very much in Mr. Robert's [sic] interests.
That's what Mr. Cronin said to Detectives Peters and Hatch back in 1994: While I was present shortly beforehand, there was a single person who stabbed and strangled Eli Cantu; that person was Michael Roberts. There is nothing in the statement, the overall context of the making of the statement to the detectives that would be deemed so far contrary to the interests of Mr. Cronin that it would be admissible in evidence, whether the state were offering it in its case for those aspects of it, which implicated the tandem of Mr. Cronin and Mr. Roberts in the commission of this crime, or whether selected portions of it were isolated out and offered on behalf of the defense.

It simply would not be appropriate evidence to put before a jury without the person making such statement being available for cross examination. Cross examination is our traditional means in the court of finding out whether a person is telling the truth or not. It's only in limited circumstances where a statement may come before the jury without the opportunity to cross-examine. This is not such a circumstance.
Again, as I said before, the rules of evidence are not applicable in a penalty phase should there be a penalty phase. Certainly, the defense would be allowed to present these statements in a penalty phase in any one of a number of different forms.
In the guilt phase, where the rules of evidence apply, those rules clearly prohibit the admission of this evidence, so I would adhere to the court's prior ruling.
20 RP at 2676-79 (emphasis added).
In order to find error, we would have to find that the trial court abused its discretion. State v. Ng, 104 Wash.2d 763, 773, 713 P.2d 63 (1985). "An abuse of discretion occurs only when no reasonable person would take the view adopted by the trial court." State v. Castellanos, 132 Wash.2d 94, 97, 935 P.2d 1353 (1997). This court may not simply substitute its judgment for the trial court's. The trial court acted within its discretion to find that Cronin's hearsay statement was not trustworthy. The court then properly excluded the statement in accordance with ER 804(b)(3).
2. Jury Instruction Regarding Aggravating Factors
Roberts argues that a defendant cannot be held liable as an accomplice for the aggravating factors in a charge of first degree aggravated murder. He asserts that the language *750 of the jury instructions in his case erroneously applied the law of accomplice liability to the specific aggravating factors of the charge against him.
Under Washington's statutes, the death penalty may be imposed when a person "[w]ith a premeditated intent to cause the death of another person, ... causes the death of such person or of a third person," and one or more aggravating circumstances are found by the jury to exist beyond a reasonable doubt. RCW 9A.32.030(1)(a), 10.95.020, and 10.95.060(4). In the case before us, the jury found the defendant guilty of premeditated murder in the first degree.
After finding the defendant guilty of premeditated murder in the first degree, the jury completed the Special Verdict Form by answering questions submitted by the court as follows:
(1) Was the murder committed by the defendant and his accomplice to conceal the commission of a crime or to protect or conceal the identity of a person committing a crime?
ANSWER: Yes
(2) Was the murder committed in the course of, in furtherance of, or in immediate flight from a robbery in the first or second degree or a kidnapping in the first degree?
ANSWER: Yes
SPECIAL INTERROGATORY
(1) Did the defendant Michael Kelly Roberts personally act with a premeditated intent to cause the death of Elijio Cantu?
ANSWER: Yes
Clerk's Papers (CP) at 2728, 2730-31.
The majority raises several questions regarding the propriety of imposing the death penalty on a defendant convicted as an accomplice to first degree aggravated murder. The majority, in fact, answers the questions itself, but chooses to ignore the answers. Instead, the majority reverses the aggravated murder conviction on grounds which might present themselves in some other hypothetical case, but which are not present here.
First, the majority questions "whether the aggravated murder statute as worded even allows for the execution of a defendant convicted as an accomplice to first degree murder." Majority at 731. The majority quickly answers its own legislative intent question by noting, among other things, that the statute provides for a mitigating circumstance where an accomplice's "participation in the murder was relatively minor...." Majority at 731 (citing RCW 10.95.070(4)).
Next, the majority questions the constitutionality of imposition of the death penalty to an accomplice. "The imposition of a capital sentence is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments if it is imposed without an individualized determination that the punishment is appropriate." Majority at 731. Under the case of Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), a defendant who drove a getaway car "could not be sentenced to death because he did not take life, attempt to take life, or intend for the death to occur." Majority at 731. The Enmund case is easily distinguished. In the case before us, the jury found by special interrogatory that Roberts did "personally act with a premeditated intent to cause the death of Elijio Cantu." Where the jury finds that the defendant intended for the death to occur, Enmund has no applicability.
The majority also cites the compelling case of Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In that case, the United States Supreme Court found that two defendants who aided their father in his escape from prison, but who did not actually commit an act of murder, could nonetheless be sentenced to death for the brutal murders committed by their father during his escape. The majority notes that Arizona law allows the death penalty for first degree felony murder (whereas Washington does not). The Supreme Court found "`major participation in the felony committed, combined with reckless indifference to human life'" sufficient to support a sentence of death. Majority at 732 (quoting Tison, 481 U.S. at 158, 107 S.Ct. 1676). The majority comments on the holding of Tison as follows: "Therefore, Tison also suggested an actus reus requirement *751 along with a mens rea requirement before the death penalty can be imposed. That requirement is at least `major participation' in the crime if the mens rea is less than intent." Majority at 732. Once again, the majority has answered the question it raised. Because the jury found that Roberts personally acted with a premeditated intent to cause the death of Elijio Cantu, the constitutional question facing the Supreme Court in Tison is not present here. Cruel and unusual punishment is only implicated, under the majority's own analysis, if the mens rea is less than intent. The jury found that Roberts personally acted with premeditated intent.
The majority then claims that the jury instruction allowed Roberts to be convicted of premeditated murder in the first degree as an accomplice. However, as acknowledged by the majority, the aggravating factors instruction and special interrogatory prevented the jury from convicting him of aggravated murder unless the State proved beyond a reasonable doubt that Roberts personally acted with a premeditated intent to cause the death of the victim. Jury instruction 9 provided in pertinent part:
You will also be asked on the special verdict form whether or not it has been proved that the defendant Michael Kelly Roberts personally acted with a premeditated intent to cause the death of Elijio Cantu. In order to answer "yes" to this question, all twelve of you must agree that this proposition has been proved beyond a reasonable doubt.
CP at 2656.
The majority questions our holding in State v. Mak, 105 Wash.2d 692, 718 P.2d 407 (1986) because it was decided before Tison. However, as the majority notes, in Mak the jury found the defendant did have a premeditated intent to kill. The same is true of Roberts. Neither Mak nor the case before us is impacted by the decision in Tison. Unquestionably, Mak remains good law whenever the jury makes a finding of a premeditated intent to kill.
I agree with the majority that the accomplice liability instruction, jury instruction 7, should have stated "the crime charged" rather than "a crime." However, because the jury was instructed in the aggravation instruction that it had to find that Roberts acted personally and with intent to cause death, such error is harmless in this case. When an instruction is clearly erroneous, prejudice is presumed. State v. Britton, 27 Wash.2d 336, 341, 178 P.2d 341 (1947), cited with approval in State v. Wanrow, 88 Wash.2d 221, 237, 559 P.2d 548 (1977). However, it is the duty of the court to scrutinize the record to determine whether such error was harmless or prejudicial. "A prejudicial error is an error which affected the final result of the case...." Britton, 27 Wash.2d at 341, 178 P.2d 341. The jury was instructed what it had to find beyond a reasonable doubt concerning Roberts' personal act and intent to kill, and the jury did so find, by special interrogatory.
Jury instructions are to be read as a whole. State v. Schulze, 116 Wash.2d 154, 167, 804 P.2d 566 (1991) ("Jury instructions must be considered in their entirety to determine if there is reversible error in a specific instruction.").
There is no question here that Roberts is being sentenced to death for anything other than what he did "personally act with a premeditated intent to cause the death of Elijio Cantu."
In summary, the aggravated murder statutes allow for the execution of an accomplice, and the instructions given in this case are valid under this Court's holding in State v. Mak. By special verdict, the jury found beyond a reasonable doubt that Roberts personally acted with the premeditated intent to cause the death of Eli Cantu. Therefore, I would affirm Roberts' conviction and sentence for the crime of aggravated murder in the first degree.
TALMADGE, and BRIDGE, JJ., concur.
NOTES
[1] Veniremembers are referred to as jurors in this opinion.
[2] Pechman was appointed a federal district judge in the United States District Court, Western District of Washington, in October 1999.
[3] Washington's ER 804(b)(3) is, for the purposes of this case, identical to the federal rule. See ER 804 cmt.
[4] See generally Valladares, 99 Wash.2d 663, 664 P.2d 508; Parris, 98 Wash.2d 140, 654 P.2d 77.
[5] State v. McDonald, 138 Wash.2d 680, 981 P.2d 443 (1999), relied upon by the State, has nothing to do with the definition of "statement" under ER 804(b)(3). McDonald simply excluded a statement made by a co-defendant to a fellow inmate on the grounds the statement was unreliable. McDonald, 138 Wash.2d at 693-96, 981 P.2d 443. The case, even on reliability grounds, however, is distinguishable here as it relates to Cronin's statement to the police.
[6] Amicus Curiae Washington Association of Criminal Defense Lawyers (WACDL) also rightly points out that Parris, Valladares, and "every single other Washington court which has appeared to do a whole narrative analysis, has done so in the singular context in which the declarant's statement inculpated the defendant.

`Whole statement' has thus served as shorthand for the analysis of ER 804(b)(3) statements of unavailable declarants purporting to incriminate the defendant." WACDL Br. at 16-17 (footnote omitted). This is not the case here.
[7] See Smith v. State, 647 A.2d 1083 (Del. 1994); State v. Hallum, 585 N.W.2d 249 (Iowa 1998), vacated on other grounds, 527 U.S. 1001, 119 S.Ct. 2335, 144 L.Ed.2d 233 (1999); State v. Lucky, 750 So.2d 801 (La. 1999); State v. Matusky, 343 Md. 467, 682 A.2d 694 (1996); State v. Ford, 539 N.W.2d 214 (Minn.1995); State v. Torres, 126 N.M. 477, 971 P.2d 1267 (1998); State v. Fuller, 337 S.C. 236, 523 S.E.2d 168 (1999); Cofield v. State, 891 S.W.2d 952 (Tex.Crim.App. 1994); State v. Mason, 194 W.Va. 221, 460 S.E.2d 36 (1995); Johnson v. State, 930 P.2d 358 (Wyo.1996); see also People v. Newton, 966 P.2d 563 (Colo.1998) (adopting Williamson in part; allowing collateral neutral statements).
[8] "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI. By definition, confrontation clause issues arise only when a hearsay statement is offered by the prosecution. See 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence ง 804.06 [6] [a] (1997) ("When the statement of an unavailable declarant inculpating both the declarant and the accused is offered against the accused, confrontation issues arise.").
[9] Unlike Washington law, Arizona law allowed the death penalty for first degree felony murder.
[10] For the complete text of the Mak aggravating factors jury instruction, see Mak, 105 Wash.2d at 740, 718 P.2d 407.
[11] As we apply established principles of state constitutional jurisprudence here, a Gunwall analysis is not required. See State v. White, 135 Wash.2d 761, 769, 958 P.2d 982 (1998) (citing State v. Gunwall, 106 Wash.2d 54, 720 P.2d 808 (1986)).
[12] Should the State try its case based on accomplice liability, these jury findings should be assured by way of special interrogatories. If, as here, such express findings are absent, we will not speculate as to the jury's reasoning. See State v. Jackson, 137 Wash.2d 712, 727, 976 P.2d 1229 (1999).
[13] The Legislature omitted a portion of the Model Penal Code provision that provided, "[w]hen causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense." Model Penal Code ง 2.06(4) (1985). The Legislature was, nevertheless, in full agreement with the content of this section; it excluded this language from the Washington statute only because it found it "redundant." Revised Washington Criminal Code, at 44-45 (Legislative Council's Judiciary Comm. 1970) (comment to revised accomplice liability statute).
[14] Thus, the State is technically correct in its statement that "you would not be able to obtain accomplice liability to certain murders because certain murders happen too quickly for a person to actually know a murder is going on an accomplice to know a murder is going to happen." 30 RP at 4162. This is relatively insignificant, however, because such defendants may still be charged with felony murder in the first degree based solely on the mens rea for the predicate offense. RCW 9A.32.030(1)(c); State v. Osborne, 102 Wash.2d 87, 93, 684 P.2d 683 (1984).
[15] The State also suggests Roberts failed to object to the denial of his pro se motion to appoint Brian Tsuchida, thereby precluding review of this issue under RAP 2.5(a). This claim is meritless. Not only did Roberts make abundantly clear his wish to have Brian Tsuchida reappointed, this issue, as will be described infra, also raises Sixth Amendment concerns allowing for review under RAP 2.5(a)(3).
[16] Roberts also suggests Superior Court Criminal Rules (CrR) 3.1(b)(2) requires an initial court appointed attorney to remain on the case until withdrawal and subsequent appointment by the trial court. While the technical wording of this rule favors Roberts, a new appointment by the court is allowed after withdrawal of initial counsel if "other factors make it necessary." CrR 3.1(b)(2). Clearly, "other factors" made it necessary here to replace Roberts' initial court appointed attorney.
[17] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[18] ER 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." ER 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."
[19] Dr. Bing did not testify that the results yielded human blood, only that they were consistent with the presence of human DNA.
[20] Although Roberts also requested jury instructions for the predicate offenses of robbery in the second degree and kidnapping in the second degree, both crimes are actually predicates for felony murder in the first degree. RCW 9A.32.030(1)(c).